**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**DONALD JAMAL WILSON,**

      **Movant,**

**v.**                          **Civil Action No. 3:10-cv-01191
(Criminal No. 3:07-cr-00034-01)**

**UNITED STATES OF AMERICA,**

      **Respondent.**

<u>**AMENDED AND SUPPLEMENTAL
PROPOSED FINDINGS AND RECOMMENDATIONS**</u>

Pending before the Court is Movant's Motion to Vacate, Set Aside or Correct Sentence pursuant to 28 U.S.C. § 2255 (Docket No. 509). The undersigned United States Magistrate Judge issued Proposed Findings of Fact and Recommendations (Docket No. 566), to which Movant filed objections (Docket No. 572). Upon reviewing the aforementioned documents, the Honorable Robert C. Chambers, United States District Judge, remanded the matter to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B) to reconsider and revise, to the extent necessary, the Proposed Findings of Fact and Recommendations in light of Movant's objections.

As a preliminary matter, the undersigned again notes that the record before the Court is well-developed and provides a sufficient basis upon which to resolve the pending motion and address the objections. After thorough consideration of the record, the undersigned conclusively **FINDS** that Movant is not entitled to the relief requested; therefore, an evidentiary hearing is not warranted. *Raines v. United States,* 423 F.2d 526,

- 1 -

529 (4th Cir. 1970). For the reasons that follow, the undersigned **RECOMMENDS** that the presiding District Judge deny Movant's Motion, dismiss this civil action, with prejudice, and remove it from the docket of the Court.

## I.    Relevant Facts

In August 2006, the Huntington Violent Crimes Drug Task Force ("Task Force") began an investigation of an apartment located at 826 Rear Jefferson Avenue, Huntington, West Virginia as a suspected location of narcotics distribution.[1] On August 4, 2006, the Task Force conducted video surveillance of the location and observed Movant, Donald Jamal Wilson ("Wilson"), entering the apartment along with an individual identified as Herbert Fordham.[2] (Docket No. 35-3 at 2). Approximately five months earlier, Fordham had been arrested by the Huntington Police Department for possession of a distribution amount of crack cocaine and marijuana. (*Id.*). On August 7, 2006, while continuing their video surveillance, officers observed Wilson's brother, Rashard Wilson, exiting the apartment and entering a gold Oldsmobile Aurora driven by a female, later identified as Maria Hetzer. (*Id.*). Task Force members had patrol officers stop the vehicle and search Rashard Wilson, who was found in possession of three baggies containing a substance that field-tested positive for cocaine. (*Id*). Based upon the substances recovered from Rashard Wilson, the surveillance of the residence, and the statement of a cooperating witness indicating that he or she had purchased marijuana at the Rear Jefferson Avenue location, Task Force member, Detective Paul Hunter, obtained a

---

[1] The factual history is based upon the record in *United States of America v. Donald Jamal Wilson,* Case No. 3:07-cr-00034-01. Citations herein are made to the docket numbers of documents filed in that criminal action.

[2] Wilson later claimed that Herbert Fordham did not appear in the videotape produced by the Government. (Docket No. 122).

warrant from Cabell County Circuit Judge Alfred E. Ferguson to search the 826 Rear Jefferson Avenue apartment. (Docket No. 35-4).

### Search of 826 Rear Jefferson Avenue

Early in the morning of August 8, 2006, Task Force and SWAT Team members executed the search warrant. During the search, officers recovered multiple baggies containing crack cocaine or cocaine powder, 58 bindles and one bag of heroin, a box of .380 ammunition, a handgun holster, a set of digital scales, two plates and a razor blade, three bags containing currency totaling $452, and miscellaneous paperwork, including a Mountaineer Gas bill in Wilson's name with an address of 128 North Altamont Road, Huntington. (Docket Nos. 35-5 and 443-3 at 49). Additional paperwork and a photograph found during the search also connected Wilson to the Rear Jefferson Avenue apartment. (Docket No. 57 at 11-12). Following the search of the apartment, Detective Hunter contacted the landlord of the property to determine who actually lived at or rented the premises. The landlord informed Hunter that for a substantial period of time Donald Jamal Wilson had been paying $200 cash on a monthly basis to rent the apartment. (*Id.* at 11). In light of the evidence recovered from the Rear Jefferson Avenue apartment and the landlord's statements, Detective Hunter obtained three warrants for Wilson's arrest on state felony charges of possession with intent to distribute heroin, crack, and cocaine powder. (*Id.* at 12; Docket No. 555-1 at 1–3).

### Arrest in Ohio and North Altamont Search

On October 27, 2006, Task Force members, Corporal Shane Bills and Detective Paul Minigh, observed Wilson driving a white Pontiac in the City of Huntington. (Docket No. 443-2 at 19–22). Corporal Bills and Detective Minigh followed Wilson as he crossed over a bridge into the State of Ohio. They took steps to enter the outstanding warrants in

the National Crime Information Center ("NCIC") database and contacted Ohio law enforcement officials to advise them of the outstanding warrants. Shortly thereafter, deputies of the Scioto County, Ohio Sheriff's Department stopped Wilson's car. (*Id.*). Bills and Minigh arrived at the scene of the traffic stop, followed fifteen minutes later by Detective Hunter and an additional Task Force member, Special Agent Tom Bevins of the Federal Drug Enforcement Agency.  (*Id.* at 21-22; Docket No. 444 at 20–21, 34).  Wilson was arrested by the Ohio deputies as a fugitive from justice. After the arrest, the deputies searched Wilson's person and automobile. During the search, the officers recovered $13,963 in United States currency, digital scales, four cell phones, a dry cleaner's receipt in Wilson's name, which listed his address as 826 Jefferson Avenue, Huntington, and paperwork addressed to Wilson at 128 North Altamont Road. (Docket Nos. 444 at 20–30 and 57 at 19). On the same day as Wilson's arrest, Task Force members obtained and executed a search warrant at 128 North Altamont Road, Huntington. The search uncovered baggies of crack cocaine, three cell phones, and letters and receipts in Wilson's name, some of which identified his address as the Rear Jefferson apartment and some of which identified his address as the house on North Altamont Road.[3] (Docket No. 443-4 at 2–9). Wilson was subsequently transferred to the custody of the West Virginia State Police to face the state felony charges. (Docket No. 555 at 4).

### Federal Complaint, Indictments, and Motions to Suppress

On January 16, 2007, Detective Hunter filed a complaint and affidavit in federal court seeking Wilson's arrest on the charge of managing a residence for the purpose of

---

[3] At trial, the property owners of both the Rear Jefferson Street apartment and the North Altamont residence testified that they rented their property to Wilson in exchange for monthly cash payments. (Docket No. 442 at 42-44 and Docket No. 443 at 7-10).

storing cocaine base. (Docket No. 1). United States Magistrate Judge Maurice G. Taylor, Jr., issued an arrest warrant for Wilson. A few days later, the state charges were dismissed, and Wilson was transferred to federal custody. Wilson applied and qualified for court-appointed counsel; accordingly, John McGhee Jr. ("McGhee") was appointed to represent Wilson. On February 14, 2007, a federal grand jury in Charleston, West Virginia issued a one-count indictment against Wilson, charging him with intentionally offering his residence at 826 Rear Jefferson Avenue for the storage of crack cocaine in violation of 21 U.S.C. § 856(a)(2). (Docket No. 15). Wilson was arraigned and entered a not guilty plea. Thereafter, standard discovery responses were filed by the United States. Upon receiving the responses, McGhee filed a motion to suppress evidence recovered during the execution of search warrants at 826 Rear Jefferson Avenue and 128 North Altamont Road. (Docket Nos. 29, 30). He additionally challenged the foundation for Wilson's arrest in Ohio and sought the exclusion of statements made by Wilson shortly after the arrest.

On April 16, 2007, the district court conducted an evidentiary hearing on McGhee's motion. (Docket Nos. 57 and 379). First, McGhee alleged that the affidavit in support of the Rear Jefferson Avenue warrant was insufficient to establish probable cause for the search. He argued that the fourth paragraph of the affidavit contained uncorroborated representations by a cooperating witness, some of which were proven false during the search. (Docket No. 379 at 9-10). According to McGhee, the witness' reliability was neither averred nor established; accordingly, Judge Ferguson erred by issuing the warrant. Second, McGhee pointed out various procedural inconsistencies involving the search warrant packet. In particular, he advised the Court that he had personally reviewed the file on record with the Cabell County Circuit Clerk and discovered

that it did not contain a copy of the attachment to the warrant setting out the property to be seized or a copy of the actual warrant itself. He conceded that copies of these documents were produced by the government in discovery, but questioned their authenticity. (*Id.* at 3-9). He emphasized that the produced documents contained multiple stamps from the Circuit Clerk's office, which suggested different filing dates. McGhee contended that these irregularities raised questions regarding the date and time on which the search warrant was issued by the Court. (*Id.* at 15–16). McGhee next attacked the execution of the arrest warrants, arguing that there was no basis to arrest Wilson on October 27, 2006. McGhee indicated that the West Virginia officers had no jurisdiction to arrest Wilson in Ohio, and the Ohio officers had no basis upon which to arrest Wilson because the West Virginia warrants were not entered into the NCIC database. Thus, without proof of outstanding warrants, the Ohio officers had no reason to stop, detain, and arrest Wilson.  (*Id.* at 18–19). As a corollary, McGhee contended that the officers' lack of jurisdiction or basis to arrest Wilson rendered inadmissible any evidence gathered or statements made by Wilson at the time of the arrest. McGhee also challenged the informal transfer of evidence from the Ohio officers to the West Virginia officers, noting that Special Agent Bevins took custody of the currency and digital scales at the scene of the arrest without proper processing or transfer by the arresting officers. (*Id.* at 21–24). Finally, McGhee argued that the search of the North Altamont property was improper because probable cause for the warrant was obtained through the illegal search and arrest of Wilson in Ohio. (*Id.* at 2-3).

Accordingly, Detective Hunter was asked to testify regarding the issuance of the Rear Jefferson Avenue search warrant and arrest warrants. (Docket No. 57 at 3–43). Detective Hunter confirmed that he prepared the search warrant, supporting affidavit,

and list of property to be searched and seized and took those documents to the home of Judge Alfred Ferguson around 1:00 a.m. on August 8, 2006. (*Id.* at 4–6). Judge Ferguson issued the warrant and shortly thereafter, members of the Huntington Police Department SWAT team and Task Force members executed it.  No one was home at the time of the search and seizure, so at the conclusion of the process, Detective Hunter prepared a property receipt itemizing the items that had been taken and left a copy of receipt at the apartment. (*Id.* at 7-9). Detective Hunter explained that prior to the search, he believed two men, Herbert Fordham and Rashard Wilson, occupied the apartment. (*Id.* at 21). However, during the search, the officers found documents that suggested that Wilson was a resident or had ties to the apartment. (*Id.*). Later, Detective Hunter located the landlord of the apartment, who confirmed that Wilson was the lessee. Accordingly, Detective Hunter wrote Wilson's name on the search warrant for the purpose of returning it to the Clerk's office. (*Id.* at 21-22). On August 10, 2006, Detective Hunter returned the search warrant packet with the property receipt to the Circuit Clerk for filing. (Docket No. 57 at 10). He could not account for the absence of certain documents in the Clerk's file nor explain the reason that the documents contained date stamps of both August 10, 2006 and August 28, 2006.  (*Id.* at 12, 23, 30).

Regarding the arrest warrants, Detective Hunter testified that after finding drugs and paperwork in the Rear Jefferson Avenue apartment and verifying Wilson as the lessee of the premises, he obtained arrest warrants for Wilson on state narcotics charges. (*Id.* at 11–12). Detective Hunter confirmed that the arrest warrants were obtained shortly after the August 2006 search of the Rear Jefferson Avenue apartment and were in effect at the time of Wilson's arrest in October 2006. (*Id.* at 14-15). Hunter explained that he had not arrested Wilson prior to October, because he could not locate him. (*Id.* at 40).

However, on October 27, 2006, Detective Hunter was notified by Corporal Bills and Detective Minigh, that they had spotted Wilson traveling in West Huntington and were following him across the bridge into Ohio. According to Hunter, the officers proceeded to enter the arrest warrants into the NCIC to provide grounds for Ohio law enforcement officers to arrest Wilson. (*Id.* at 15).  When the arrest was made, Bills and Minigh were present at the scene. Hunter arrived approximately fifteen minutes later and subsequently observed Corporal Bills explaining to Wilson the nature of the charges against him and giving Wilson his Miranda rights. The Ohio officers searched Wilson's vehicle and discovered, among other things, paperwork that linked Wilson to a residence on North Altamont Road in Huntington. (*Id.* at 15-19). Based upon this paperwork, Hunter applied for a warrant to search that residence. (*Id.*).

After considering McGhee's arguments, the presiding district judge ruled that the search warrant issued for the Rear Jefferson Avenue apartment was valid.  (Docket No. 40). Although expressing concern over the reliability of the cooperating witness, the Court emphasized that probable cause was assessed on the totality of the circumstances. (*Id.;* Docket No. 379 at 11–15).  Even after discounting the statements of the cooperating witness, the Court found that the remaining three paragraphs of the affidavit supported a finding of probable cause upon which to issue the search warrant. (*Id.*). The Court noted McGhee's contention that the absence of documents in the state court file and the various date stamps on the search warrant raised questions regarding its validity, but determined that these clerical irregularities did not affect the admissibility of the evidence collected pursuant to the search warrant. (*Id.;* Docket No. 379 at 16–18). In light of the testimony of Detective Hunter, the Court found no evidence of a procedural breach that rose to the level of a constitutional violation.

The Court further determined that the arrest in Ohio was appropriate in light of valid West Virginia arrest warrants, explaining that the Ohio officers were not required to confirm the existence of the warrants in NCIC before arresting Wilson as a fugitive from justice. (Docket Nos. 40 and 379 at 19-20). Moreover, the Court found that Wilson had been Mirandized prior to making statements at the time of his arrest and, thus, those statements were admissible. The Court withheld ruling on whether the immediate transfer of the evidence recovered from Wilson's vehicle from the Ohio officers to Agent Bevins and the West Virginia officers resulted in the inadmissibility of the evidence, granting McGhee an opportunity to research the issue and file a supplemental motion to suppress on that ground. (Docket Nos. 40 and 379 at 22).

On April 17, 2007, a federal grand jury convened in Huntington and returned a seven-count superseding indictment against Wilson and three co-defendants, Herbert Fordham, Bryant Holloway, and Rashard Wilson. (Docket No. 41). The superseding indictment charged the defendants with various offenses involving the possession and distribution of crack cocaine and cocaine, including conspiracy to distribute 50 grams or more of crack cocaine. The superseding indictment also charged Wilson with making the Rear Jefferson Avenue apartment and the North Altamont residence available for the unlawful storage of crack cocaine. (*Id.*).

On May 29, 2007, McGhee renewed Wilson's motion to suppress, again challenging the search at 826 Rear Jefferson Avenue, arguing that Detective Hunter's supporting affidavit was insufficient to establish probable cause and requesting that all evidence discovered at the apartment be suppressed. (Docket No. 85). In addition, McGhee reiterated that because Wilson's subsequent arrest in Ohio and the search of his residence at 128 North Altamont were based on the constitutionally invalid search of 826

Rear Jefferson Avenue, all evidence discovered through those two events should similarly be suppressed. (*Id.*). McGhee supplemented the motion on July 6, 2007 when discovery revealed that Detective Hunter may have been mistaken when he identified Fordham as one of the visitors to the Rear Jefferson Avenue apartment and had relied upon this mistake in completing the affidavit in support of the search warrant.  (Docket No. 122).

On September 5, 2007, a federal grand jury returned a second superseding indictment against Wilson and his co-defendants, adding an additional co-conspirator, Ms. Fiasili Fitisemanu Bartram. (Docket No. 197). On September 6, 2007, the district court conducted a hearing on pretrial motions, during which the court considered Wilson's renewed and supplemental motion to suppress. The district court denied Wilson's motion on the basis that the alleged mistake by Detective Hunter did not constitute a knowing and intentional falsehood; accordingly, the validity of the search warrant was not affected. (Docket No. 229 at 15–16). On September 13, 2007, McGhee filed a third motion to suppress evidence, again attacking the affidavit supporting the request for the Rear Jefferson Avenue warrant and seeking to exclude all evidence flowing from the original search. (Docket No. 234). In this motion, McGhee pointed out that the affidavit relied upon evidence obtained secondary to the March 17, 2006 arrest of Herbert Fordham and the August 7, 2006 arrest of Rashard Wilson, and because the incidental searches of Fordham and Rashard Wilson were improper, the evidence obtained during these searches could not be used as the basis to issue the 826 Rear Jefferson Avenue search warrant. (*Id.*). On October 22, 2007, the Court held a hearing on the third motion to suppress and subsequently enter an order denying it.  (Docket No. 282).

On November 6, 2007, Wilson's co-defendants pled guilty to violating 21 U.S.C. § 846. Wilson likewise intended to enter a guilty plea, but changed his mind at the plea

hearing and decided to proceed to trial. (Docket No. 363). On November 14, 2007, a three-count third superseding indictment against Wilson was returned by a federal grand jury. (Docket No. 374). The indictment charged Wilson with: (1) conspiracy to distribute 50 grams or more of cocaine base, a quantity of cocaine, and a quantity of heroin in violation of 21 U.S.C. § 846; (2) making available, as a lessee, a residence at 826 Rear Jefferson Avenue, Huntington, West Virginia for the purpose of storing cocaine base and heroin in violation of 21 U.S.C. 856(a)(2); and (3) making available, as a lessee, a residence at 128 North Altamont Road, Huntington, West Virginia, for the purpose of storing cocaine base in violation of 21 U.S.C. § 856(a)(2). Subsequently, the United States filed an information with the district court pursuant to 21 U.S.C. § 851 seeking an enhanced sentence based on Wilson's prior felony drug convictions. (Docket No. 421).

### *Trial, Conviction, and Sentencing*

Wilson's three-day jury trial began on December 11, 2007. At trial, the government offered nine of Wilson's acquaintances, including his former co-defendants, to testify about the distribution of controlled substances in Huntington and Wilson's involvement in the distribution chain. Witness Kerwin McKinney testified that he came to Huntington from Detroit in 2002 or 2003 in order to sell drugs. (Docket No. 442 at 5). During the course of selling drugs, he became acquainted with other dealers in Huntington, including a man named George Holloway. According to McKinney, Holloway's right-hand man in his drug operation was an individual named Laverge Johnson. (*Id.* at 5–7). In addition, McKinney identified Wilson's former co-defendants, Bryant Holloway, Herbert Fordham, and Rashard Wilson, as colleagues of George Holloway. (*Id.* at 7-15). McKinney testified that he also knew of Wilson and was aware that Wilson sold drugs, although McKinney did not have much personal contact with Wilson until they were both detained

at the Carter County Detention Center. (*Id.* at 19–23). McKinney recounted that while they were in detention together, Wilson explained that he had been arrested in Ohio, his house "on the hill" was searched, and drugs were recovered during the search.  Wilson also spoke of an apartment that had been searched and in which drugs were found, stating that Herbert Fordham had "brought the heat on him" by storing drugs in the closet of the apartment.  (*Id.*).

Witness Roger Terry testified that he began purchasing crack cocaine from Herbert Fordham in 2006 because Fordham's prices were better than other dealers. (*Id.* at 29-34). To arrange for a purchase, Terry would call Fordham's cell phone and meet him at a designated location. (*Id.* at 30–35). On at least one occasion when Terry purchased crack, Fordham was accompanied by Wilson. (*Id.*) Terry also testified regarding a conversation he subsequently had with Wilson while the two were in the Carter County Detention Center.  According to Terry, Wilson advised that he had been arrested in Ohio and charged with conspiracy to sell narcotics after several guys had been arrested for drug trafficking in a house that Wilson rented.  (*Id.* at 36-37). Wilson told Terry that at the time of his arrest in Ohio, he was on his way to Detroit to purchase more drugs and the officers had confiscated his money. (*Id.* at 37). Wilson allegedly explained that he also obtained drugs from Detroit to sell in Huntington by having "females drive him" or by sending guys on a Greyhound bus to retrieve the drugs. He admitted that he was the "boss" of that group of drug dealers. (*Id.*). On cross examination, Terry confirmed his understanding that Fordham and Wilson worked together in the business of distributing crack cocaine in Huntington.  (*Id.* at 39-40).

Witness Laverge Johnson testified that in 2000, at age sixteen, he was recruited by George Holloway to leave Detroit and join Holloway's drug trafficking operation in

Huntington. (Docket No. 442-1 at 2). Johnson began selling crack that Holloway purchased in Detroit, sometimes traveling to Detroit by bus to collect and transport Holloway's crack back to Huntington. (*Id.* at 3–4). Johnson indicated that Holloway lived in Barboursville and sold drugs out of an apartment near downtown Huntington.  At the time, Holloway was working with Herbert Fordham, who would sometimes provide crack to Holloway when he ran out of his supply. (*Id.* at 5-6). Eventually Holloway was arrested, prosecuted and jailed for drug trafficking, and Fordham took control of the business. (*Id.* at 6–7).   After that, Johnson began to purchase crack from Fordham and on two occasions, Johnson traveled to Detroit to retrieve crack for Fordham. (*Id.* at 7–8). According to Johnson, he often purchased crack from Fordham at Wilson's Rear Jefferson Avenue apartment. (*Id.* at 9). While there, Johnson saw scales to weigh crack and baggies for storage. He also saw Rashard Wilson. Johnson confirmed that Wilson sold heroin to Rashard Wilson and also sold crack, indicating that Fordham occasionally bought crack from Wilson so that Fordham would not have to make a trip to Detroit to restock his supply. (Docket No. 442-1 at 11–14).

Rashard Wilson testified that he came to Huntington in 1997 to improve his life by selling drugs. (*Id.* at 24). He bought from any dealer who had crack available, including George Holloway, and would break the crack into pieces for sale to users. When Holloway went to prison, Rashard Wilson began purchasing crack primarily from Herbert Fordham and Laverge Johnson. (*Id.* at 29–30). Rashard Wilson identified the apartment on Rear Jefferson Avenue as his brother's rental and confirmed that he had purchased crack from Fordham at the apartment. (*Id.* at 32–36). Rashard Wilson denied purchasing crack from his brother, but admitted that Wilson sold him heroin. (*Id.*) He testified that he began to purchase heroin for resale because his crack sales were not generating enough profit.

- 13 -

(Docket No. 442-1 at 36).

Herbert Fordham testified that he was currently incarcerated for conspiracy to distribute crack cocaine. (*Id.* at 47–48). He admitted that he was involved in the conspiracy with three or four other people and sold crack during the years of 2002 through 2007. (*Id.* at 49). Fordham indicated that he first came to Huntington from Detroit in 1998 or 1999 to sell crack cocaine. (Docket No. 442-2 at 1). At that time, Fordham typically traveled to Detroit twice each month to buy crack and would return to Huntington to break it up and sell it. (*Id.* at 1–2). Buyers contacted him on his cell phone, and he would arrange the location of the sale. While in Huntington, Fordham renewed an acquaintance with George Holloway, who was from Fordham's neighborhood in Detroit. (*Id.* at 3). Like Fordham, Holloway sold crack cocaine and was working with Laverge Johnson out of a house they shared in Huntington. (*Id.* at 4). Fordham recalled that Wilson arrived in Huntington in 2001 0r 2002, also to sell crack.  Fordham knew Wilson from Detroit, where Fordham had lived with Wilson's family for a while. (*Id.* at 1-6). When Wilson first arrived, he lived with a friend named Susan Barrett, who was a known crack user. (*Id.* at 7). Later, Wilson lived at 826 Rear Jefferson Avenue and on several occasions, Fordham bought crack from Wilson at that location. (*Id.*  at 9-10). Fordham also confirmed that Wilson sold heroin and recalled that, at times, Wilson asked Fordham to deliver heroin to Laverge Johnson when Wilson was too busy to make the delivery. (*Id.* at 16–17). Fordham testified that Wilson did not live at Rear Jefferson regularly and also had a house on North Altamont near Fifth Street Hill in Huntington. Fordham admitted knowing Wilson's brother, Rashard, and Wilson's girlfriend, Tara Carter, and acknowledged that Ms. Carter drove him to Detroit to get additional drugs for resale. (*Id.* at 15-18).  When asked if he had ever sold crack cocaine out of the Rear Jefferson Avenue

apartment, Fordham denied selling or storing his crack at that residence. (*Id.* at 20-21). He further denied that the crack cocaine and heroin that were found in the apartment during execution of the search warrant belonged to him. On cross examination, Fordham identified his co-conspirators as Bryant Holloway, Rashard Wilson, and Rashard Wilson's girlfriend, Fiasili Fitisemanu Bartram. (*Id.* at 22). He further admitted to having a "buy/sell relationship" with George Holloway and Laverge Johnson. (*Id.* at 25-26).

Tara Carter testified that she first met Wilson in 2001 or 2002 through his brother, Steven Walker, and shortly thereafter, they became involved romantically. (Docket No. 442-2 at 31–32). At that time, Wilson lived in an apartment on Jefferson Avenue. Ms. Carter testified that during her relationship with Wilson, he was unemployed; however, he paid the rent and utilities on the apartment. (*Id.* at 32–33, 36). She indicated that Wilson asked her to put the utilities in her name and also asked her to have his vehicle titled in her name, both of which she did at his request. (*Id.*). Ms. Carter denied having knowledge of Wilson's business ventures or sources of income, but testified that he had two cell phones and received many calls at night. After getting the calls, he often left the apartment for short periods of time. (*Id.* at 34–35). She admitted having seen baggies of crack cocaine stored in the apartment. Ms. Carter also testified that she drove an individual known as Little Steve to Detroit on several occasions because he did not have a driver's license. She specifically recalled one trip that she made to Detroit with Herbert Fordham and Little Steve. She recounted that she drove the men in a van that belonged to Wilson and, once in Detroit, they met up with Wilson. Ms. Carter recalled that Holloway stayed in Detroit, and she drove the van back alone with Little Steve and Wilson following behind her in another vehicle. (*Id.* at 40–42). On cross examination, Ms. Carter testified that she had rented apartments in Huntington at the request of Herbert Fordham. She

confirmed that during a police interview, she informed the police that Herbert Fordham supplied Rashard Wilson, George Holloway, Laverge Johnson and others with drugs, but denied that she had ever witnessed Wilson conducting any drug transactions. (*Id.* at 45–46).

Fiasili Fitisemanu Bartram testified that she became romantically involved with Rashard Wilson in 2002, and they had three children together. (*Id.* at 49). Approximately one year after she started seeing Rashard Wilson, he was arrested. At that time, Ms. Bartram learned that Rashard worked as a drug trafficker, generally selling crack cocaine. (*Id.* at 50). Eventually, he went to jail, so Ms. Bartram began selling crack in his absence. (Docket No. 442-3 at 1). Ms. Bartram often purchased crack for resale from Herbert Fordham and cocaine for personal use from Laverge Johnson. (*Id.* at 6–9). Four or five months after Rashard Wilson was released from jail, he started selling crack again, which he generally bought from Herbert Fordham. (*Id.* at 7). Ms. Bartram testified that she continued selling, as well, and obtained her crack from Herbert Fordham and occasionally from Wilson at or near the Rear Johnson Avenue apartment. (*Id.* at 11-15). She described going to the apartment and observing Fordham break a piece of crack off of a larger piece to sell to her. (*Id.* at 14–15). Ms. Bartram identified a photograph of the residence on North Altamont Road as Wilson's home, but denied ever purchasing drugs from Wilson at that location. (*Id.* at 17). Ms. Bartram recalled driving Rashard Wilson to the house on "Fifth Street Hill" (North Altamont Road residence) on one occasion so that he could buy crack cocaine from Wilson. (Docket No. 442-3 at 17–18). Finally, Ms. Bartram testified regarding a July 2006 incident involving her, Rashard Wilson, and Laverge Johnson. She described their efforts to sell crack cocaine and heroin from a motel room. According to Ms. Bartram, the heroin that they sold was supplied by Wilson. (*Id.*

at 22–26).

Another witness, Susan Barrett, testified that she was a crack addict and became acquainted with Wilson as a supplier of the drug. (Docket No. 443 at 21–23). Generally, when Ms. Barrett needed to buy crack, she would call Wilson on his cell phone and he would either bring it to her house or meet her somewhere. (*Id.* at 23–24). She indicated that Wilson typically took an amount of crack, like an ounce, and cut it up into smaller units, and then packaged them for sale. (*Id.* at 25). Ms. Barrett testified that she also knew Herbert Fordham, Rashard Wilson, Laverge Johnson, and Fiasili Bartram from her dealings with crack. (*Id.* at 25–26). According to Ms. Barrett, Wilson was the "main person" in that group of dealers. (*Id.)*. She recalled that when Wilson first moved to Huntington, she let him stay at her house in exchange for crack. While there, Wilson openly sold the drug. Barrett witnessed Wilson cutting up crack, weighing the pieces, and placing them in baggies for sale. (Docket No. 443 at 27-28). She indicated that Wilson later brought his brother, Rashard, to Huntington to help make deliveries and answer cell phone requests for crack. (*Id.* at 28–29). Rashard took the orders, obtained the crack from Wilson, delivered it, and returned with cash, which he gave to Wilson. (*Id.*). In addition to Rashard, Wilson used Little Steve and others to help him sell drugs. Barrett could not recall all of the dealers' names, indicating that the deals were arranged through cell phone; consequently, she knew the dealers by their cell phone numbers rather than their names. (*Id.* at 25). She did remember that Wilson's brother, Little Steve, had a cell phone with the number 412-8216, which was later used by Herbert Fordham. (*Id.* at 25, 29). Ms. Barrett testified that Wilson obtained crack and heroin for distribution from a connection in Detroit and transported the drugs back to Huntington in the bottom of Pringles potato chip cans. (*Id.* at 31). Ms. Barrett could not estimate how much crack

cocaine Wilson brought back from Detroit on his runs, but did recall one occasion on which he left her with 68 grams of crack to sell for him. She testified that Wilson had become concerned because several local drug dealers had been arrested and he thought he should leave town. Instead of selling the crack, Ms. Barrett smoked it. (Docket No. 443 at 31–32). She admitted that she eventually began selling crack to support her habit and obtained her supply from Wilson. On occasion, she would order crack from Wilson and Rashard Wilson would deliver it. (*Id.* at 34). Ms. Barrett testified that she also purchased crack from Wilson's former co-defendant, Bryant Holloway, although the delivery might be made by someone else, such as Herbert Fordham or Rashard Wilson. (*Id.* at 40). When asked about the Rear Jefferson Avenue apartment, Barrett testified that she often met Wilson near the apartment to buy crack and also met him at a Park-n-Ride near Fifth Street Hill. (*Id.* at 34–36). However, Ms. Barrett denied that she was ever in the Rear Jefferson Avenue apartment and indicated that she was not familiar with the North Altamont residence. (*Id.*).

Finally, Joseph Brooks testified that he first became acquainted with Herbert Fordham in 1999. (Docket No. 443-1 at 14). Brooks was looking to buy crack and Fordham had crack to sell. After Brooks had been buying from Fordham for awhile, Fordham asked Brooks to rent various houses around Huntington for Fordham in exchange for crack. (*Id.* at 15–16). Through this arrangement, Brooks met other drug dealers, including Rashard Wilson. Brooks testified that one residence he rented for Fordham on Chesterfield Avenue became a place for the dealers to stash their drugs. (*Id.* at 17–19). He recalled seeing large amounts of crack stored at the house and indicated that several people sold from that location. He also recalled seeing large amounts of money at the residence. (*Id.* at 20–21). The money was soaked in the bathtub to make it

shrink and then would be wrapped in cellophane. Brooks testified that Herbert Fordham was the "boss" of the others and gave them directions on what to sell and how much to charge. (*Id.* at 21–22). Approximately one year after meeting Fordham, Brooks met Wilson at the Chesterfield Avenue location. Brooks indicated that Wilson dealt mainly with Fordham, stating, "I don't think that [Wilson] really said anything to the guys under him other than [Fordham]. I don't think he had to deal with anybody but [Fordham]." (*Id.* at 22). Brooks confirmed that Fordham and Wilson had a "drug business" and that Wilson often supplied Fordham with drugs. (Docket No. 443-1 at 22–23). According to Brooks, Wilson had a number of people working for him in addition to Fordham. Brooks testified that he would call Wilson's cell phone to arrange a purchase of crack and often someone else would deliver it. Brooks also recalled seeing Wilson and his girlfriend, Tara, at a residence on West Fifth Avenue where Brooks would go to purchase drugs. (*Id.* at 24). At times, he met Wilson to buy drugs near Wilson's Rear Jefferson Avenue apartment or near his home up Fifth Street Hill. (*Id.* at 25–28). Usually Wilson would be alone when he made deliveries, although sometimes Fordham would be with him. Brooks recalled one occasion when he made an arrangement to sell Fordham a green Thunderbird. He took the vehicle to a car wash where he planned to meet Fordham and found Fordham there with Wilson. Brooks observed Wilson give Fordham some crack, which Fordham gave to Brooks in exchange for the vehicle. (*Id.* at 34). Brooks further admitted that he purchased heroin from Wilson at times and knew that Wilson also had cocaine powder to sell.  (*Id.* at 35–36).

In addition to the evidence from Wilson's co-defendants and acquaintances, the Government offered West Virginia State Trooper G. N. Losch, Sergeant J.T. Combs, Detective Minigh, Detective Hunter, Corporal Bills, and Special Agent Bevins to testify

regarding various aspects of the investigation, searches, and arrest of Wilson. At the conclusion of the trial, Wilson was convicted of all three charges in the indictment. (Docket No. 429).

On March 24, 2008, the district court held a sentencing hearing. (Docket No. 490). Wilson's base offense level under the sentencing guidelines was determined to be 34 as he was found responsible for conspiracy to distribute at least 500 grams of cocaine base. Two points were added to Wilson's base offense level because of the involvement of a firearm. Another point was added because of Wilson's status as a career offender, resulting in a total offense level of 37 and a Criminal History Category of VI. In view of the mandatory minimum triggered by application of Section 841, Wilson was sentenced to life imprisonment without possibility of release on Count One of the indictment. On the remaining counts, the district court sentenced Wilson to 240 months, each, to be served concurrently with Count One. The district court entered its Judgment on March 26, 2008 (Docket No. 480), and Wilson filed a timely notice of appeal, challenging his conviction and sentence.

### *Appeal and Motion to Vacate*

The United States Court of Appeals for the Fourth Circuit ("Fourth Circuit") appointed McGhee to continue representation of Wilson on appeal. (Docket No. 488). On April 21, 2008, Wilson filed a motion with the Fourth Circuit requesting that he be appointed new counsel. By order dated May 21, 2008, the Fourth Circuit appointed Jacob A. Manning to represent Wilson. (Docket No. 497). On appeal, Manning argued that the district court erred in denying Wilson's motions to suppress evidence retrieved at the Rear Jefferson Avenue apartment because the search warrant was not supported by probable cause. Appellate counsel argued: (1) that there was nothing to demonstrate the

reliability of the cooperating witness; (2) that the rest of the affidavit contained conclusory statements, which did not support a finding of probable cause; (3) that the good-faith exception to the exclusionary rule did not apply; and (4) that the evidence recovered should have been suppressed because the search warrant was invalid.[4]  *United States of America v. Donald Jamal Wilson*, 318 Fed.Appx. 198, 199 (4th Cir. 2009). On October 5, 2009, the Court issued its opinion affirming Wilson's conviction. The Court concluded that, although "the information provided by the cooperating witness was not verified or shown to be reliable[,]" the rest of the affidavit contained sufficient evidence to support a finding of probable cause. *Id.* at 199–200. Therefore, the evidence recovered during the search of Wilson's apartment was admissible.

On October 6, 2010, Wilson filed the instant Motion to Vacate Sentence. (Docket No. 509). In this motion, Wilson argues that his trial and appellate counsel rendered ineffective assistance. Wilson further contends that his Fifth Amendment rights were violated by Respondent in civil forfeiture proceedings and by prosecutorial misconduct at trial. On October 20, 2010, Wilson filed a Motion to Amend, providing additional support for his Motion to Vacate Sentence. (Docket No. 512).

## II.  <u>Movant's Grounds for Vacating, Setting Aside, or Correcting His Sentence.</u>

Wilson identifies four grounds in support of his Motion to Vacate. First, Wilson alleges that he had ineffective assistance of trial counsel. In particular, Movant contends that trial counsel's representation was inadequate in the following ways:

---

[4] Wilson contends that he did not raise his eight claims of ineffective assistance of trial counsel because he "was informed by Appellate Counsel that [his] only chance for relief was through the 4th Amendment attacking the probable cause of the search warrant."

(1) Trial Counsel failed to move the Court after Lead Detective conceded to altering the search warrant after its execution.

(2) Trial Counsel failed to challenge the absence of the supporting affidavit for the State arrest warrants.

(3) Trial Counsel failed to file a motion to suppress evidence seized during [Movant's] arrest after informing [Movant] and the Court that he intended to.

(4) Trial Counsel failed to file a motion to dismiss the conspiracy count of the indictment because it lacked sufficient facts to support probable cause.

(5) Trial Counsel failed to file a motion challenging the admissibility of the statements and testimony of co-conspirators and informants after the alleged conspiracy was terminated.

(6) Trial Counsel failed to file a motion for dismissal after discovering that [Movant] was held in a State jail in violation of the Speedy Trial Act's "ruse exception."

(7) Trial Counsel failed to expose perjury [sic] testimony by conducting proper investigation into the record of Pre-Trial Hearing held 4-16-07, where Lead Detective Paul Hunter gave testimony which was contradictory to testimony given by DEA Agent Tom Bevins during trial. DEA Agent Bevins testified to arriving at the scene of Petitioner's arrest with Lead Detective Hunter in the same vehicle, while Detective Hunter testified that Agent Bevins arrived shortly after the stop.

(8) Trial Counsel failed to conduct investigation into Petitioner's arrest by interviewing arresting officers from the Ohio Sheriff's Office or by pursuing the dispatch records after the Ohio Sheriffs [sic] denied having them. Trial Counsel failed to subpoena the arresting officers for trial.

(Docket No. 509 at 4–5).

Second, Wilson contends that he had ineffective assistance of appellate counsel.

According to Wilson, his counsel failed in his representation in the following ways:

(1) Appellate Counsel failed to raise the claim that the warrant by which the contraband for which [Movant] was arrested was tampered with.

(2) Appellate Counsel failed to raise the issue of discrepancies concerning the clerk's seal or stamp on several of the documents.

(3) Appellate Counsel failed to challenge the conspiracy conviction based on the insufficient evidence used to support it.

(4) Appellate Counsel failed to raise the inadmissibility of the statements and testimony of co-conspirators and informants after the alleged conspiracy was terminated.

(5) Appellate Counsel failed to raise (sic) violation of the Speedy Trial Act's "ruse exception."

(6) Appellate Counsel failed to expose perjury (sic) testimony by conducting proper investigation into the record of Pre-Trial Hearing held 4-16-07, where Lead Detective Paul Hunter gave testimony which was contradictory to testimony given by DEA Agent Tom Bevins during trial. DEA Agent Bevins testified to arrive at the scene of [Movant's] arrest with Lead Detective Hunter in the same vehicle, while Detective Hunter testified that Agent Bevins arrived shortly after the stop.

(*Id.* at 6–7).

Third, Wilson argues that Respondent committed a Fifth Amendment Takings violation. Specifically, Wilson asserts that Respondent arrested him without a warrant and seized $13,963 worth of currency from him without probable cause because there was no evidence connecting the currency to any illegal activity. (*Id.* at 9).

Finally, Wilson contends that his Fifth Amendment due process right to a fair trial was violated. According to Wilson, he was denied his due process rights in two ways: (1) the Prosecutor and Lead Detective conspired to present fabricated documents to the Court and (2) the Prosecutor knowingly solicited false testimony from one of its witnesses. (*Id.* at 10).

## III.   <u>Standard of Review</u>

### A.   **28 U.S.C. § 2255**

A motion made pursuant to § 2255 is a collateral attack on a conviction or sentence imposed in a separate proceeding. To succeed on such a motion, the movant must prove by a preponderance of the evidence that the conviction or sentence was imposed in

violation of the laws or Constitution of the United States; or the Court imposing the sentence lacked jurisdiction; or the sentence exceeded the maximum authorized by law; or the sentence was otherwise subject to collateral attack. 28 U.S.C. § 2255. Because a § 2255 motion seeks to deny, evade, or impeach a judgment entered in another proceeding, claims of error that have previously been raised and rejected on a direct appeal of the judgment may not be raised again in a § 2255 motion.

Generally, when assessing the validity of a § 2255 motion, the reviewing Court isolates issues that have already been rejected on appeal and dismisses them as procedurally barred. Next, the Court identifies claims that are procedurally defaulted and—to the extent that they allege constitutional issues for which the movant is unable to show cause and actual prejudice or a miscarriage of justice—summarily disposes of them. After completing these tasks, the Court can address the substance of the remaining claims. If the movant is clearly unable to state a claim that entitles him to relief, the Court may deny the Motion without the need for an evidentiary hearing. *Raines v. United States,* 423 F.2d 526, 529 (4th Cir. 1970).

## B.    Ineffective Assistance of Counsel

Wilson argues that his conviction is subject to collateral attack because both his trial and appellate counsels were ineffective under *Strickland v. Washington*, 466 U.S. 668 (1984). In support of his argument, Wilson asserts eight grounds of trial counsel's alleged ineffective assistance and six grounds[5] for appellate counsel's alleged ineffective assistance.[6] Although Wilson did not raise an ineffective assistance of counsel claim on

_____

[5] All six of these claims are based on appellate counsel's failure to raise specific issues on direct appeal to the Fourth Circuit Court of Appeals.

[6] Five of the six claims of ineffective assistance of appellate counsel are substantively identical to ineffective assistance of trial counsel claims raised by Wilson.

direct appeal, such claims may nonetheless be the subject of a proper § 2255 petition despite a failure to seek direct review. *See Massaro v. United States,* 538 U.S. 500, 509 (2003) (holding that ineffective assistance claims may be properly raised in a § 2255 motion even if they could also have been raised on appeal); *United States v. DeFusco*, 949 F.2d 114, 120–21 (4th Cir. 1991) (holding same).

      Criminal defendants have a constitutional right to effective assistance of counsel. In the case of indigent defendants, this right guarantees the effective assistance of court-appointed counsel through direct appeal of any judgment rendered against them. *Anders v. California,* 386 U.S. 738 (1967). When a Movant charges ineffective assistance of counsel as a basis for relief under 28 U.S.C. § 2255, the burden is on the Movant to prove that his attorney failed to provide effective assistance. *Strickland*, 466 U.S. at 689. In *Strickland,* the United States Supreme Court adopted a two-pronged test for evaluating whether a defendant received inadequate assistance of counsel. *Id.* A defendant must show (1) that counsel's representation fell below an objective standard of reasonableness and (2) that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 687–91. As the Fourth Circuit indicated in *United States v. Roane,* "[a] defendant asserting an IAC [inadequate assistance of counsel] claim must therefore satisfy both prongs, and a failure of proof on either prong ends the matter." 378 F.3d 382, 406 (4th Cir. 1994). "[J]udicial scrutiny of counsel's performance must be highly deferential." *Strickland*, 466 U.S. at 689. Counsel's performance must be assessed with "a context-dependent consideration of the challenged conduct as seen from counsel's perspective at the time." *Wiggins v. Smith,* 539 U.S. 510, 523 (2003). While assistance "which is ineffective in preserving fairness does not meet the constitutional mandate," *Strickland*, 466 U.S. at 685–86, "defects in assistance that

have no probable effect upon the trial's outcome do not establish a constitutional violation." *Mickens v. Taylor,* 535 U.S. 162, 166 (2001).

The first prong of the *Strickland* test is competence, which is measured against the standard of reasonably effective assistance. The movant must first identify the specific acts or omissions of counsel which were purportedly incompetent and then demonstrate by a preponderance of the evidence that they fell below an objective standard of reasonableness under prevailing professional norms. *Strickland*, 466 U.S. at 687–91. "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Id.* at 687. Because legal services involve, to a great degree, the exercise of judgment in fluid circumstances, an evaluation of their reasonableness is inherently difficult. In evaluating whether counsel's performance was deficient, "[i]t is all too tempting for a defendant to second guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Wiggins*, 539 U.S. at 523. Hence, "court[s] must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance ... [and] that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* (internal quotation marks omitted). The Court must be highly deferential when scrutinizing the performance of counsel, because "[t]here are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." *Strickland*, 466 U.S. at 689. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged

conduct, and to evaluate the conduct from the counsel's perspective at the time." *Id.*

The second prong of the *Strickland* test is prejudice. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id.* at 694 (citing *United States v. Morrison*, 449 U.S. 361 (1981)). "Representation is an art, and an act or omission that is unprofessional in one case may be sound or even brilliant in another. Even if a defendant shows that particular errors of counsel were unreasonable, therefore, the defendant must show that they actually had an adverse effect on the defense." *Strickland*, 466 U.S. at 694. Because the purpose of the Sixth Amendment's guarantee of effective counsel is to ensure the integrity of the proceeding, deficiencies in counsel's performance will not amount to ineffective assistance unless the performance undermines the reliability of the proceeding's outcome. It is insufficient for the defendant "to show that the errors had some conceivable effect on the outcome of the proceeding," because "[v]irtually every act or omission of counsel would meet that test." *Id.* at 693. Rather, "the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695. An attorney's mere mistake, ignorance or inadvertence, alone, does not constitute proof of ineffective assistance. *Murray v. Carrier,* 477 U.S. 478 (1986).

The standard for ineffective assistance of appellate counsel is generally the same as for trial counsel. *Bell v. Jarvis*, 236 F.3d 149, 164 (4th Cir. 2000). Accordingly, in order to show ineffective assistance of appellate counsel, Wilson must satisfy the two-part test outlined in *Strickland v. Washington. Evicts v. Lucy,* 469 U.S. 387 (1985). In order to establish a claim that appellate counsel was ineffective for failing to pursue a claim on direct appeal, Wilson must demonstrate (1) that his "counsel's representation fell below

an objective standard of reasonableness" in light of the prevailing professional norms, *Strickland,* 466 U.S. at 688, and (2) that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694; *see Smith v. Robbins,* 528 U.S. 259, 285–86 (2000) (holding that habeas applicant must demonstrate that "counsel was objectively unreasonable" in failing to file a merits brief addressing a nonfrivolous issue and that there is "a reasonable probability that, but for his counsel's unreasonable failure ..., he would have prevailed on his appeal").

On review, appellate counsel is accorded the "presumption that he decided which issues were most likely to afford relief on appeal." *Pruett v. Thompson*, 996 F.2d 1560, 1568 (4th Cir. 1993). Moreover, "[c]ounsel is not obligated to assert all nonfrivolous issues on appeal." *Bell*, 236 F.3d at 164. Instead, "[t]here can hardly be any question about the importance of having the appellate advocate examine the record with a view to selecting the most promising issues for review." *Jones v. Barnes*, 463 U.S. 745, 752 (1983). "Winnowing out weaker arguments on appeal and focusing on those more likely to prevail, far from evidence of incompetence, is the hallmark of effective appellate advocacy." *Smith v. South Carolina,* 882 F.2d 895, 899 (4th Cir. 1989) (quoting *Smith v. Murray*, 477 U.S. 527, 536 (1986)). Although it is "still possible to bring a Strickland claim based on counsel's failure to raise a particular claim" on direct appeal, demonstrating that counsel was incompetent for failing to do so will be difficult. *Robbins*, 528 U.S. at 288. "Generally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome." *Gray v. Greer*, 800 F.2d 644, 646 (7th Cir. 1986).

With this legal framework in mind, the undersigned examined each act or omission of counsel that Wilson challenged as ineffective. Having considered the alleged incidents of ineffective assistance, the undersigned finds that in every one, Wilson fails to demonstrate deficient performance or establish prejudice as required by *Strickland*. Therefore, his motion to vacate on the grounds of ineffective assistance of counsel should be dismissed.

IV.   **Analysis**

     A.   **Overlapping Claims of Ineffective Assistance**

     1.   *Altered Search Warrant*

First, Wilson argues that trial counsel rendered ineffective assistance because he "failed to move the Court after Lead Detective conceded to altering the search warrant after its execution." (Docket No. 509 at 4). Similarly, Wilson asserts that appellate counsel provided ineffective assistance by failing to "raise the claim that the warrant by which the contraband for which [Wilson] was arrested was tampered with." (Docket No. 509 at 6). In particular, Wilson contends that Detective Hunter improperly added Wilson's name to the Rear Jefferson Avenue search warrant after its execution in violation of 18 U.S.C. § 1512(c)(1).[7] Wilson's claim presumes that any alteration of or notation on a search warrant by a law enforcement officer renders the warrant invalid. Because the notation of Wilson's name on the search warrant occurred after execution of the warrant and did not alter its substantive elements, the notation did not invalidate the

---

[7] Wilson's assertion that Hunter's notation violated 18 U.S.C. § 1512(c)(1) is unequivocally contradicted by the record. Title 18 U.S.C. § 1512(c)(1) prohibits an individual from "corruptly" altering a record or document "with the intent to impair [its] integrity or availability in an official proceeding." Detective Hunter certainly never intended to impair the integrity or availability of the warrant. To the contrary, he steadfastly advocated its validity.

search warrant itself or the execution of the search warrant.[8]

Having reviewed the record, the undersigned finds no evidence that the search warrant was altered or modified in a manner that affected its integrity or validity. Any questions regarding the issuance and content of the search warrant were thoroughly addressed and resolved at Wilson's initial suppression hearing. At the suppression hearing, Detective Hunter explained at length the procedure by which he prepared, obtained, and executed the search warrant. (Docket No. 57 at 3–43). Hunter testified that after execution of the warrant and following his discussion with the property owner, he wrote Wilson's name in the corner of the search warrant for the purpose of returning it to the Circuit Clerk. Hunter indicated that prior to collecting that evidence, he was unaware of Wilson's ties to the apartment; thus, Wilson's name was added later. (*Id.* at 21–22).

Contrary to Wilson's contention, the two cases he cites do not support his position. In *Brown v. Byer*, the Fifth Circuit Court of Appeals affirmed a § 1983 jury verdict against a law enforcement officer who altered arrest warrants. 870 F.2d 975 (5th Cir. 1989). The warrants were issued after someone passed six bad checks bearing the name Tamie Brown at a convenience store. The back of the checks contained a driver's license number and other information which had been taken by the store clerk. The warrants issued by the magistrate bore the name of "Tamie Brown" and included the driver's license number found on the back of the checks. After the warrants were issued, but before they were executed, the law enforcement officer unilaterally changed the name on the warrant to "Tammy Jean Brown," and altered the driver's license number and address to coincide

---

[8] In his objections, Wilson alleges that his name was added to the search warrant in order "to initiate federal charges" against him. (Docket No. 572 at 2). Nothing in the record supports such an assertion. The search warrant was executed on August 8, 2006 and the evidence collected formed the basis of a criminal complaint filed against Wilson a few days later on state felony drug possession charges. Federal proceedings were not initiated until January 2007.

with the license number and address of plaintiff, Tammy Jean Brown. Consequently, Ms. Brown was wrongfully arrested pursuant to the modified warrants. Ms. Brown sued the officer and received a jury verdict in her favor. On appeal, the officer argued that he had a good faith basis for altering the warrants. Upholding the jury's verdict, the Fifth Circuit found sufficient evidence to support the inference that the officer's alteration of the arrest warrants after their issuance and prior to execution resulted in "a classic Fourth Amendment violation: a decision to arrest an individual without a valid arrest warrant for that person and absent any circumstances that would justify such an arrest." *Brown*, 870 F.2d at 978.

Whereas *Brown* was concerned with the wrongful alteration of an arrest warrant *prior* to its execution, Wilson challenges an alleged "alteration" of a search warrant *after* its execution. In changing the name and driver's license number on the arrest warrants, the officer in *Brown* fundamentally altered the identity of the subject of the arrest warrants, leading to the wrongful arrest of an innocent person. In contrast, the subject of the search warrant in the present case was the 826 Rear Jefferson Avenue apartment. A search warrant must describe with particularity the place to be searched and the items to be seized. U.S. Const. amend. IV. The addition of Wilson's name to the search warrant after its execution did not affect the warrant's substantive provisions because the warrant still contained the same  "place to be searched" and "items to be seized" that were authorized by Judge Ferguson.

In the second case, *Ramirez v. Butte-Silver Bow County*, homeowners brought a *Bivens* and § 1983 action against federal and county law enforcement officers, alleging a violation of their Fourth Amendment rights through execution of an invalid search warrant. 283 F.3d 985 (9th Cir. 2002), *amended and superseded on denial of rehearing*

*by Ramirez v. Butte-Silver Bow County*, 298 F.3d 1022 (9th Cir. July 25, 2002), *affirmed by Groh v. Ramirez*, 540 U.S. 551 (2004). In this case, an ATF agent prepared an application for a search warrant for the Ramirez's home, properly describing the place to be searched and the items to be seized. However, the warrant itself entirely omitted the items to be seized, and in their place included a duplicate description of the Ramirez's home. The application and affidavit for the search warrant were not attached to the warrant itself. After arriving at the Ramirez's home and prior to execution of the search warrant, the ATF agent attempted to correct the error in the warrant by orally identifying the items to be seized. The Ninth Circuit held that the Ramirez's Fourth Amendment rights were violated by the ensuing search because the written warrant did not state with particularity the items to be seized, or refer to or incorporate the application or affidavit, and the officer was not empowered to amend the warrant prior to its execution. *Ramirez*, 298 F.3d at 1026.

The circumstances of *Ramirez* are easily distinguished from those in the present case. *Ramirez* involved a facially invalid search warrant and a clumsy attempt at a oral modification to the warrant *prior* to its execution. The ATF agent's correction materially altered the items to be seized, changing them from the Ramirez's house to illegal firearms and explosive devices found in the house. In comparison, Detective Hunter made a note of Wilson's name in the margin of a valid search warrant, *after* the execution of that warrant. Detective Hunter's addition of Wilson's name did not modify, in any manner, "the place to be searched" (826 Rear Jefferson Avenue) or "the items to be seized" (narcotics, drug paraphernalia, firearms, etc). While case law indicates that law enforcement officers cannot substantively modify or amend a warrant *prior* to its execution, Wilson does not identify, and the undersigned has not found, any case law that

suggests a warrant is invalidated when a notation of the type at issue here is made following execution of the warrant.

At the first suppression hearing, Wilson's trial counsel thoroughly questioned Detective Hunter about the addition of Wilson's name to the search warrant. (Docket No. 57 at 21–22). Once it was clear that Wilson's name was added to the warrant **after** its execution and counsel's motion to suppress was denied, further pursuit of suppression based upon that same ground would have been frivolous. Ultimately, the district court and the Fourth Circuit held that the search warrant for 826 Rear Jefferson Avenue was valid *at the time of its execution*. Therefore, Wilson cannot demonstrate that the failure of counsel to repeatedly challenge Detective Hunter's alleged "alteration" fell below an objective standard of reasonableness. In addition, Wilson cannot demonstrate with reasonable probability that the result of his trial or direct appeal would have been different if counsel had again raised the issue. Accordingly, Wilson's claim of ineffective assistance of counsel on this ground is meritless.

2.    *Conspiracy Charge*

Second, Wilson argues that trial counsel rendered ineffective assistance when he failed to file a motion to dismiss the conspiracy indictment for lack of probable cause. (Docket No. 509 at 4). Similarly, Wilson asserts that appellate counsel was ineffective by not raising on appeal a claim of insufficiency of evidence related to the conspiracy conviction. (*Id.* at 6). Wilson argues that Respondent failed to present any evidence to substantiate the testimony of his co-conspirators or demonstrate that he joined the conspiracy with an understanding of its unlawful nature. (Docket No. 555 at 37). The undersigned finds these claims to be baseless. Wilson's conviction of conspiracy to distribute narcotics definitively established probable cause for the grand jury indictment.

Further, the overwhelming evidence presented at trial regarding Wilson's involvement in the conspiracy rendered any challenge to his conviction frivolous.

In challenging his indictment for conspiracy to distribute narcotics, Wilson ignores two critical points. First, a federal grand jury found probable cause to support the conspiracy charge. Traditionally, courts have declined to review the sufficiency of evidence presented to a grand jury. *United States v. Wills,* 346 F.3d 476, 488–89 (4th Cir. 2003). Second, a defendant challenging a grand jury's proceedings must overcome a heavy burden; a burden that becomes heavier after a jury conviction. Because a conviction necessarily requires a finding of guilt beyond a reasonable doubt, it conclusively establishes that there was probable cause to indict. *United States v. Mechanik*, 475 U.S. 66, 67 (1986) (holding "the petit jury's verdict of guilty beyond a reasonable doubt demonstrate *a fortiori* that there was probable cause to charge the defendants with the offenses for which they were convicted."). Wilson was convicted of conspiracy to distribute narcotics. Given that his conviction conclusively establishes the existence of probable cause to indict him, Wilson's contention that trial counsel should have challenged the indictment for lack of probable cause is decidedly unpersuasive.

Wilson's criticism of his appellate counsel is equally unpersuasive. In order to convict a defendant for the crime of conspiracy to distribute narcotics, the United States must prove beyond a reasonable doubt: "(1) an agreement between two or more persons to engage in conduct that violates a federal drug law ...; (2) the defendant's knowledge of the conspiracy; and (3) the defendant's knowing and voluntary participation in the conspiracy." *United States v. Hickman,* 626 F.3d 756, 763 (4th Cir. 2010) (internal quotation marks and citation omitted). Proof of a "tacit or mutual understanding" is sufficient to establish a conspiratorial agreement, and such proof may be inferred from

circumstantial evidence. *United States v. Ellis,* 121 F.3d 908, 922 (4th Cir. 1997); *see also United States v. Yearwood,* 518 F.3d 220, 225 (4th Cir. 2008) (holding that because a conspiracy by its nature is clandestine and covert, a conspiracy charge is usually proven by circumstantial evidence.); *United States v. Laughman,* 618 F.2d 1067, 1074 (4th Cir. 1980). In *United States v. Burgos,* 94 F.3d. 849 (4th Cir. 1996), the Fourth Circuit engaged in a lengthy discussion of the proof needed to sustain a conviction of conspiracy, emphasizing that the covert and clandestine nature of a conspiracy frequently results in little direct evidence of the agreement. As such, defendant's participation in a conspiracy may be proven solely by circumstantial evidence.  "Circumstantial evidence tending to prove a conspiracy may consist of a defendant's 'relationship with other members of the conspiracy, the length of this association, [the defendant's] attitude [and] conduct, and the nature of the conspiracy.'" *Id.* at 858, c*iting United States v Collazo,* 732 F.2d 1200, 1205 (4th Cir. 1984). The Court explained that the Government need not prove that the defendant knew the particulars of the conspiracy or even all of his co-conspirators. "Indeed, a defendant properly may be convicted of conspiracy without full knowledge of all of [the conspiracy's] details, but if he joins the conspiracy with an understanding of the unlawful nature thereof and **willfully joins in the plan on one occasion**, it is sufficient to convict him of conspiracy, even though he had not participated before and even though he played only a minor part. *Burgos,* 94 F.3d at 858, citing *United States v. Roberts,* 881 F.2d 95, 101 (4th Cir. 1989) (emphasis added). Put simply, even a "small fish" in the conspiracy is nonetheless a co-conspirator. *United States v. Burgos, supra* at 858. Once the Government proves beyond a reasonable doubt the existence of a conspiracy, "the evidence 'need only establish a slight connection between the defendant and the conspiracy to support conviction.' " *United States v. Kellam,* 568 F.3d 125, 139

(4th Cir. 2009), *cert. denied,* 130 S.Ct. 657, 175 L.Ed.2d 501 (2009) (quoting *United States v. Brooks,* 957 F.2d 1138, 1147 (4th Cir. 1992)).

Moreover, a defendant challenging the sufficiency of the evidence "bears a heavy burden." *United States v. Beidler,* 110 F.3d 1064, 1067 (4th Cir. 1997). In reviewing sufficiency of evidence, the court views the evidence in the light most favorable to the prosecution and asks whether *any* rational trier of fact could have found the necessary elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (internal citations omitted). The jury, rather than the reviewing court, weighs the credibility of witnesses and resolves any factual disputes. *United States v. Smith*, 429 F. App'x 237, 238 (4th Cir. 2011) (citing *Beidler,* 110 F.3d at 1067 (internal quotation marks omitted)). "Reversal for insufficient evidence is reserved for the rare case where the prosecution's failure is clear." *Beidler*, 110 F.3d at 1067 (internal quotation marks omitted).

According to Wilson, Respondent failed to present evidence showing that he knowingly participated in a conspiracy. (Docket No. 555 at 38). Wilson emphasizes that "[t]he most significant circumstance relied on by the Government in support of the jury's finding of guilt is the fact that Petitioner was observed entering and exiting [the 826 Rear Jefferson Avenue residence] on one occasion." (*Id.* at 40). Therefore, Wilson contends that an appeal based on a sufficiency of the evidence argument would have been meritorious and appellate counsel was ineffective for failing to present the issue to the Fourth Circuit. The trial record simply does not bear out the factual premise underlying Wilson's claim.

Wilson clearly fails to appreciate the weight of the evidence against him. Multiple witnesses testified to Wilson's significant role in drug trafficking operations in

Huntington. For example, Susan Barrett testified that Wilson was a major source of crack in the area and specifically recruited his brother, Rashard, to come to Huntington and help fill orders. Rashard Wilson, Herbert Fordham, and Wilson spent large amounts of time together, shared use of the Rear Jefferson Avenue apartment, and each sold crack cocaine at or near that residence. Herbert Fordham used a cell phone number that previously belonged to Little Steve, who used the number when he was selling crack for Wilson. Herbert Fordham admitted that he sold crack and conspired with others to distribute crack.  He further acknowledged that Wilson sold heroin and that Fordham would occasionally deliver the drug to Laverge Johnson when Wilson was too busy. Fiasili Bartram acknowledged that she, Rashard Wilson, and Laverge Johnson jointly sold drugs out of a motel room, including heroin supplied by Wilson. Joseph Brooks described renting houses in Huntington at the request of Herbert Fordham that were used as places to stash and sell drugs. Brooks further confirmed the connection between Fordham and Wilson, suggesting that Fordham handled the dealers and Wilson supplied Fordham. Brooks recalled one specific occasion in which Wilson gave Fordham crack to give to Brooks in exchange for an automobile. Laverge Johnson admitted buying crack from Fordham at Wilson's Rear Jefferson Avenue Apartment. This testimony established a tacit, if not explicit, agreement between Wilson and some or all of his co-defendants to purchase and sell controlled substances. Respondent further introduced the testimony of law enforcement officers who detailed their surveillance and investigation of Wilson's activities related to the distribution of narcotics. The landlords for the 826 Rear Jefferson Avenue apartment and 128 North Altamont home both testified that Wilson was the lessee of the residences; narcotics were found stored in and reportedly distributed from the residences. Further, Respondent presented evidence of the quantity of drugs and drug

paraphernalia recovered from the properties, the digital scales found in the trunk of Wilson's automobile, and the large amount of United States currency seized from Wilson at the time of his arrest. As this review of the evidence demonstrates, the United States had considerably more proof to establish Wilson's "knowing participation" in the conspiracy than a single observation of him entering and exiting the Rear Jefferson Avenue apartment.

In light of the substantial evidence of Wilson's involvement in the conspiracy, his appellate counsel would have been foolish to direct the Fourth Circuit's attention to this indisputably weak argument. "Generally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome." *Gray v. Greer*, 800 F.2d 644, 646 (7th Cir. 1986). An attack on the sufficiency of the evidence supporting Wilson's conspiracy conviction was unlikely to succeed and was, without doubt, substantially weaker than the Fourth Amendment probable cause claim raised by appellate counsel. Therefore, the undersigned finds that Wilson cannot demonstrate either deficient performance or prejudice based upon appellate counsel's decision not to raise a claim of insufficiency of evidence.

### 3. *Admissibility of Co-Conspirators' and Informants' Testimony*

Wilson next argues that trial counsel rendered ineffective assistance when he failed to challenge the admissibility of the statements and testimony of police informants and Wilson's co-conspirators. (Docket No. 509 at 4). Similarly, Wilson asserts that appellate counsel rendered ineffective assistance when he "failed to raise the inadmissibility of the statements and testimony of co-conspirators and informants after the alleged conspiracy was terminated." (*Id.* at 6). In support, Wilson alleges that inadmissible hearsay statements and testimony were offered to the grand jury by co-conspirators and

unindicted co-conspirators who had signed plea agreements.[9] He also complains that hearsay testimony was admitted at trial and that no "independent nonhearsay evidence" of a conspiracy was presented that would allow the admissibility of co-conspirator hearsay statements pursuant to FRE 801(d)(2)(E). (Docket No. 555 at 41-45).[10]

Having reviewed the trial testimony specifically identified by Wilson, as well as the remaining trial testimony, the undersigned finds scant evidence of hearsay testimony and even scanter evidence of hearsay testimony that was elicited or offered without triggering an objection by Wilson's trial counsel. Indeed, the testimony about which Wilson complains is not hearsay. Consequently, Wilson's claim of ineffective assistance of counsel fails because the management of the alleged hearsay statements by trial and appellate counsel was not deficient under *Strickland*.

Hearsay is an out of court statement offered to prove the truth of the matter asserted. FRE 801(c). Certain statements, although made out of court, do not constitute hearsay, including an admission by a party opponent. FRE 801(d)(2)(A). In the present case, Wilson's co-conspirators and the government informants testified regarding Wilson's involvement in the purchase and distribution of narcotics. These witnesses

---

[9] To the extent that Wilson challenges the introduction of testimony by informants and co-conspirators to the grand jury, the law is well-settled that evidentiary restrictions, such as the rule against hearsay, do not apply in grand jury proceedings. *United States v. R. Enters., Inc.*, 498 U.S. 292, 298 (1991); *In re Grand Jury Subpoena (T-112)*, 597 F.3d 189, 197 (4th Cir. 2010) ("It is thus well-established that grand juries may consider broad-ranging sources of evidence, admissible at trial or not, as part of their mandate to uncover criminal acts."). Because a grand jury merely determines whether there is probable cause to prosecute a defendant, its sources of information are "widely drawn, and the validity of an indictment is not affected by the character of the evidence considered." *R. Enters., Inc.*, 498 U.S. at 298; *United States v. Calandra,* 414 U.S. 338, 345–46 (1974).

[10] Wilson argues that his counsel should have challenged the admissibility of the testimony under FRE 104(a) because it was not properly admitted as a statement by a party's co-conspirator. Wilson argues that a co-conspirator's statement can only be admitted if it was made in furtherance of the conspiracy. Here, the statements were made after the conspiracy had terminated; therefore, they were not admissible. The undersigned need not address the merits of this contention because the challenged testimony either did not contain out of court statements or was admissible pursuant to FRE 801(d)(2)(A).

testified in person and were subject to cross-examination. The vast majority of testimony included statements by the witnesses of their actions, observations of Wilson's actions, and their own involvement in the use and distribution of drugs in Huntington. Wilson argues that Laverge Johnson, Rashard Wilson, and Susan Barrett should not have been permitted "to give declarations and narratives of past acts" when they described their experiences with Wilson. Given that nearly all trial testimony involves the recitation of past events, Wilson's objection is puzzling. In addition, Wilson complains that Roger Terry should not have been permitted to testify about a conversation he purportedly had with Wilson while in detention. Terry testified that during this conversation Wilson admitted his role in a drug trafficking operation and confirmed that he was traveling to Detroit to buy drugs when he was arrested in Ohio. That testimony clearly is admissible as an admission by a party opponent. In summary, the challenged testimony included descriptions of past transactions, witness observations, and opposing party admissions and was made by witnesses while under oath and on the witness stand. Accordingly, trial and appellate counsel had no legitimate basis upon which to contest its admissibility.

4.     *Speedy Trial Act*

Fourth, Wilson contends that trial counsel rendered ineffective assistance by failing to file a motion to dismiss the indictment on the basis that it violated the Speedy Trial Act. (Docket No. 509 at 4). Wilson likewise argues that appellate counsel rendered ineffective assistance when he failed to attack Wilson's conviction on an indictment that violated the Speedy Trial Act. (*Id.* at 6). Wilson claims that the United States was obligated to indict him within 30 days after taking custody of the evidence seized from Wilson during his arrest. (Docket No. 555 at 45-47). Instead, the United States allowed Wilson to remain in state custody for approximately three months as a "ruse" to by-pass

the requirements of the Speedy Trial Act. (*Id.*). Hence, under the Speedy Trial Act's "ruse" exception, Wilson's urges that his indictment was invalid and required dismissal.

The Speedy Trial Act requires the United States to file an indictment within 30 days of an individual's arrest. 18 U.S.C.A. § 3161(b). For the Speedy Trial Act's time limit to commence:

> a person must be held for the purpose of answering to a federal charge. *Thus, if one is held by state officers on a state charge and subsequently turned over to federal authorities for federal prosecution, the starting date of the time period is the date that the defendant is delivered into federal custody.* However, if the person is held in state custody at the request of federal authorities, the date of arrest by the state officers is controlling.

*U.S. v. Woolfolk*, 399 F.3d 590, 596 (4th Cir. 2005) (quoting *United States v. Iaquinta*, 674 F.2d 260, 267 (4th Cir. 1982)) (emphasis added). In *Woolfolk*, the Fourth Circuit adopted the "ruse exception"[11] to the Speedy Trial Act, recognizing that the Act could be triggered by something other than actual federal custody and federal arrest (i.e., "any restraint resulting from federal action"). *Woolfolk*, 399 F.3d at 596 (internal citation omitted). A restraint resulting from federal action sufficient to initiate the 30-day time limit, "occurs when the Government has knowledge that an individual is held by state authorities solely to answer to federal charges." *Woolfolk*, 399 F.3d at 596. The Fourth Circuit explained its reasoning for the adoption of the ruse exception:

> The requirements of the Act would lose all meaning if federal criminal authorities could collude with civil or state officials to have those authorities detain a defendant pending federal criminal charges solely for the purpose of bypassing the requirements of the Speedy Trial Act. If a court found evidence of such collusion, the provisions of the Act could be applied to state or civil detentions.

---

[11] Under the ruse exception, "Speedy Trial Act time periods may be triggered by state detentions that are merely a ruse to detain the defendant solely for the purpose of bypassing the requirements of the Act." *Woolfolk*, 399 F.3d at 596 n.7 (quoting *United States v.* Benitez, 34 F.3d 1489, 1494 (9th Cir. 1994)).

*United States v. Rodriguez-Amaya,* 521 F.3d 437, 441–42 (4th Cir. 2008) (quoting *United States v. Cepeda-Luna*, 989 F.2d 353, 357 (9th Cir. 1993)).

In the present case, Wilson argues that DEA Agent Bevins took custody of the evidence three days after Wilson's arrest by West Virginia officers. (Docket No. 555 at 45). According to Wilson, the state and federal governments "knew or should have known" at that time that federal criminal proceedings would be initiated against him; therefore, the only logical conclusion is that the state continued to hold Wilson solely to answer federal charges.[12] (*Id.* at 45-47).

In *U.S. v. Patlan*, 2009 WL 1795368 (E.D.Va. June 22, 2009), a Fourth Circuit district court considered an argument analogous to the one made by Wilson. In *Patlan*, the defendant was detained on February 17, 2009 and held in administrative detention by Immigration and Customs Enforcement (ICE) after he admitted that he had been previously deported and had illegally re-entered the United States. *Patlan*, 2009 WL 1795368 at *1. ICE referred the case to the United States Attorney's Office (USAO) and transferred the evidence used to initiate civil detention proceedings against the defendant to the USAO on April 1, 2009. *Id.* On April 8, 2009, an ICE agent signed an affidavit and criminal complaint before a United States Magistrate Judge who issued a federal arrest warrant on that date. *Id.* The arrest warranted was executed the next day on April 9, 2009. On May 7, 2009, a grand jury issued a one-count indictment charging the defendant with illegal re-entry. *Id.*

The defendant moved to dismiss the indictment, claiming a violation of the Speedy Trial Act. *Patlan*, 2009 WL 1795368 at *1. The defendant argued that the Speedy Trial

---

[12] Wilson's contention that no state criminal complaint existed will be addressed in the section discussing motions to suppress, *infra.*

Act's protections were triggered when the ICE agent assembled the evidence that the defendant had re-entered the United States after deportation, committing a criminal offense. *Id.* at *2. According to the defendant, when the ICE agent assembled this information and transferred it to the USAO for purposes of criminal prosecution on April 1, 2009, the Act's 30-day time limit was triggered. *Id.* In response, the Government argued that the 30-day time limit was triggered on April 9, 2009, when the defendant was detained pursuant to the arrest warrant issued by the United States Magistrate Judge. *Id.*

After reviewing both parties' arguments, the district court found defendant's argument failed because it assumed that collection of evidence by the ICE agent was solely for the purpose of criminal prosecution; the district court concluded that this assumption was unsupported by the evidentiary record. *Id.* at *3. The court emphasized that, despite the transfer of evidence to the USAO for the purposes of a federal criminal prosecution, the defendant was still eligible for administrative detention in the time period prior to his detention on federal criminal charges. *Id.* Further, the district court noted that there were no allegations that ICE delayed pursuing the criminal prosecution of the defendant, delayed discovering facts relevant to the charge against him, delayed obtaining an arrest warrant, delayed effecting the defendant's arrest pursuant to that warrant, or colluded with the Government in any way. *Patlan*, 2009 WL at *1 (citing *United States v. Rodriguez-Amaya,* 521 F.3d 437, 442 (4th Cir. 2008) (finding the ruse exception did not apply, despite a two-month delay between Rodriguez-Amaya's initial civil detention and the issuance of a criminal arrest warrant and another delay of twenty days before the criminal arrest warrant was served, because Rodriguez-Amaya did not show collusion or that his detention did not have an administrative purpose.)).

Wilson's detention in state custody is analogous to the defendant's detention in administrative custody in *Patlan*. Shortly after Wilson's detention on state charges, a federal agent, Agent Bevins, retrieved evidence seized at the time of Wilson's arrest on state charges and used it, presumptively, to prepare for the filing of federal criminal charges against Wilson. At the time Agent Bevins took custody of the evidence, Wilson was still eligible for state detention pursuant to the pending state criminal charges. During the time period in which Wilson was in state custody, there are no allegations that the State of West Virginia delayed pursuing its prosecution of Wilson, delayed discovering facts relevant to the charges against him, or colluded with the Government in this matter. Although Wilson relies on *Woolfolk*, he fails to address how either part of the Fourth Circuit's reasoning applies to this case. *Woolfolk* held that an individual's detention by a state triggered the Speedy Trial Act "*after state proceedings against [the defendant] terminated*" and "when the Government knew or should have known that the defendant was restrained *solely to answer federal charges*." *Woolfolk*, 399 F.3d at 596 (emphasis added). In the present case, federal charges were initiated, a detainer was placed, and subsequently the state charges were dismissed. At that point, Wilson was transferred to federal custody to answer the federal charges.

Further, Wilson claims that his state detention was based solely on the anticipated federal criminal prosecution. The fact that the state "knew or should have known that federal charges were forth coming" does not trigger the 30-day time limit of the Speedy Trial Act. Both state and federal criminal charges may arise from the same conduct. *See Rinaldi v. United States*, 434 U.S. 22, 28, 98 S.Ct. 81, 54 L.Ed.2d 207 (1977) ("dual sovereignty" doctrine); *Woolfolk*, 399 F.3d at 595 (collecting cases). Therefore, state and federal authorities frequently prosecute individuals simultaneously. The federal

government's investigation and prosecution of Wilson did not nullify the validity of the State of West Virginia's own detention, investigation, and prosecution of Wilson. *See Lee,* 818 F.2d at 305. Rather, three *state* arrest warrants for Wilson were issued from the Cabell County Magistrate Court on August 8, 2006 based upon *state* criminal charges. (Docket No. 555-1 at 1–3). Courts have applied the ruse exception in cases where state or federal authorities have admitted to detaining a defendant on state or federal administrative charges specifically to provide the federal government the time and evidence necessary time establish the defendant's guilty beyond a reasonable doubt on the federal criminal charge. *See, e.g.*, *United States v. Vasquez-Escobar*, 30 F.Supp.2d 1364, 1367 (M.D.Fla. 1998). As noted above, no evidence of such collusion exists here. Therefore, the Speedy Trial Act's 30-day time limit began on January 25, 2007, the date that the Wilson was delivered into federal custody. *See Woolfolk*, 399 F.3d at 596 (quoting *Iaquinta*, 674 F.2d at 267). Following his transfer to federal custody, Respondent properly indicted Wilson on February 14, 2007, within the 30-day limit required by the Speedy Trial Act. (Docket No. 15).

To prove deficient performance, Wilson must show that counsel's representation was objectively unreasonable *Strickland*, 466 U.S. at 688, and that the acts and omissions of counsel fell outside the range of professionally competent assistance." *Id.* at 690. Based on the foregoing review of Wilson's Speedy Trial Act claim, it was not unreasonable for trial counsel and appellate counsel to forgo the Speedy Trial claim. Because the claim lacks merit, raising it would have been frivolous and would have undermined the credibility of Wilson's other arguments. The undersigned finds trial counsel's and appellate counsel's actions in this case to have been objectively reasonable.

Moreover, to satisfy *Strickland's* prejudice prong, a "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694. As the undersigned has determined that Wilson's indictment was proper under the Speedy Trial Act, Wilson cannot demonstrate any prejudice that resulted from trial counsel's failure to file a motion alleging a Speedy Trial Act violation or from appellate counsel's decision not to raise the issue on appeal.

     5.     *Perjury Investigation*

Finally, Wilson claims that trial and appellate counsel rendered ineffective assistance when they failed to investigate and challenge alleged instances of perjury by government witnesses. (Docket No. 509 at 5, 7). Wilson contends that DEA Agent Bevins was not present at Wilson's arrest in Ohio.  (Docket No. 572 at 5-6).  Therefore, testimony by Bevins and Detective Hunter indicating that Bevins was present at the scene is perjury. In support of his factual premise, Wilson states that (1) Bevins described seeing money on the hood of the Sheriff's vehicle, but it was raining too hard for the money to be left outside, and (2) Bevins testified he came to the arrest with Hunter, but Hunter testified that Bevins came separately, which is inconsistent testimony tending to prove a cover-up. (Docket No. 555 at 47-48; Docket No. 572 at 5). Wilson asserts that Bevins and Hunter lied about Bevins' presence to conceal Hunter's lack of jurisdiction over the evidence seized during the arrest. According to Wilson, if his counsel had more thoroughly investigated the circumstances of the arrest, they would have uncovered the lies and effectively suppressed incriminating evidence.

Having examined the record, the undersigned finds that Wilson cannot establish the factual foundation underlying this ineffective assistance of counsel claim. Four

individuals confirmed that Agent Bevins was present at the scene of Wilson's arrest. At trial, Corporal Bills recalled that Bevins and Hunter arrived at the scene of the arrest at the same time. (Docket 443-2 at 21-27). By that time, Wilson had already been arrested and placed in the back of an Ohio police cruiser. (*Id.*). Detective Minigh similarly indicated that Hunter and Bevins arrived at the scene of the arrest in the same vehicle. (Docket 443-3 at 12). Agent Bevins testified that the arrest marked the beginning of his involvement in Wilson's case. Bevins recalled that he arrived at the scene with Hunter approximately fifteen minutes after Wilson had been detained by the Ohio officers. (Docket No. 444 at 20-29). Bevins observed that Wilson had been placed in the back of a cruiser and that the Ohio officers had retrieved a bag of money from Wilson. Bevins decided to count the money with the assistance of an Ohio officer, and they got into the back of another vehicle to count and secure the evidence. (*Id.*). Finally, Detective Hunter testified at the suppression hearing that Bills and Minigh were already present on the scene with Wilson and the Ohio officers when Hunter arrived. (Docket No. 57 at 15-16). Agent Bevins also arrived after Wilson's arrest, and Wilson was already in the back of a police cruiser. (*Id.*). The mere fact that Hunter did not testify that he and Bevins rode in the same car is a minor discrepancy and not proof of perjury.

In addition to the testimony, documents prepared at or shortly after the arrest establish Bevins' presence at the scene. On the day of the arrest, Bevins took custody of the evidence recovered by the Ohio officers and stored it temporarily at the Huntington Police Department. (Docket No. 555-1 at 75-77). He placed some of the exhibits in DEA self-sealing bags which he later transferred to the Charleston DEA office. At trial, Bevins identified the bagged evidence and testified regarding his notations on the bags. (Docket No. 444 at 21-29). Bevins also prepared a report dated November 3, 2006 in which he

related the details of the arrest, identifying by name the officers participating in the arrest from the Scioto County Sheriff's Department and noting the presence of the other officers from West Virginia. The information contained in the report is entirely consistent with the testimony of the other witnesses. When balancing the weight of the "evidence" offered by Wilson against the evidence appearing in the record, the preponderance of the evidence weighs decidedly against Wilson's contention that Bevins was not present at the scene shortly after Wilson's arrest.

Defense counsel's duty to investigate requires counsel to make reasonable investigations or "to make a reasonable decision that makes particular investigations unnecessary." *Strickland,* 466 U.S. at 690–91. A court's review of counsel's decision not to investigate is highly deferential in light of the circumstances at the time of counsel's representation. *Id.* at 691. Even if counsel's decision not to investigate is professionally unreasonable, judgment in a criminal proceeding will not be set aside unless the error impacted the outcome of the trial. *Id.* Ultimately, if counsel thoroughly reviews the facts and law, counsel's investigatory decisions is "virtually unchallengeable." *Id.* at 690.  Here, Wilson offers no legitimate reason for counsel to have further investigated or challenged the testimony of the officers that Bevins was present at the scene of the arrest. Wilson's contention that four law enforcement officers lied under oath in an elaborate cover-up is simply implausible.  The officers had no motive to lie; particularly, as the evidence seized by the Ohio law enforcement officers was destined to end up in West Virginia sooner or later. Thus, in the absence of any demonstration of deficient performance or prejudice, the undersigned finds that this claim is meritless.

### B.    Remaining Claims of Ineffective Assistance of Trial Counsel

Wilson spends much of his reply memorandum attacking the basis of his arrest in

Ohio. (Docket No. 555 at 13-37). He suggests that the arrest was illegal because (1) no complaint or affidavit was presented to support the issuance of the arrest warrants; therefore, the warrants were void *ab initio* and (2) the arrest warrants were not entered into the NCIC database at the time of his arrest; therefore, the Ohio officers had no basis upon which to arrest and detain him.  (Docket No. 555 at 13-21). Wilson argues that trial counsel rendered ineffective assistance when he failed to discover the lack of a complaint; when he failed to more thoroughly investigate Wilson's arrest in Ohio; when he failed to subpoena the Ohio officers to trial; and when he failed to file a motion to suppress the evidence seized during Wilson's arrest. (Docket No. 509 at 4-5).[13] Wilson concludes that trial counsel's negligence had a "profound" affect on the outcome of his case. (Docket No. 555 at 49). According to Wilson, it was "clear" that his Fourth Amendment rights were violated; thus, trial counsel's failure to challenge this violation was an error so fundamental that trial counsel was not functioning as counsel guaranteed by the Sixth Amendment. (*Id.* at 23).

Once again, Wilson fails to establish by a preponderance of the evidence the factual underpinnings of his claim. As proof that a criminal complaint was never filed in state court, Wilson offers only (1) a self-serving and unsupported assertion that he never received a copy of a state complaint "in discovery, nor at any time throughout this case" and (2) that the United States has conceded in response to Wilson's motion to vacate that

---

[13] The undersigned addresses counsel's alleged failure to challenge the absence of an affidavit or complaint in support of the state arrest warrants in this section. Ancillary to this argument, Wilson claims that probable cause did not exist for his arrest because the only evidence Detective Hunter had in his possession was a videotape of Wilson entering and exiting the Rear Jefferson Avenue apartment and hearsay from the landlord that Wilson rented the apartment. (Docket No. 555 at 14-15). Wilson simply ignores the fruits of the search of his apartment, which included a considerable amount of heroin, baggies of crack, and baggies of cocaine powder. Certainly, that evidence, combined with Wilson's role as lessee of the apartment, provided probable cause to arrest Wilson for possession with intent to distribute.  Probable cause made be based upon hearsay evidence and does not require proof beyond a reasonable doubt.

it does not have a copy of the complaint or affidavit.[14] (Docket No. 572 at 6). Even when giving full credit to these assertions, they do not overcome the weight of the remaining evidence, which preponderates in favor of a finding that a criminal complaint was sworn by Detective Hunter and presented to Magistrate Brenda Chapman on August 8, 2006 and provided the basis for the three warrants issued for Wilson's arrest.  The evidence is as follows:

Wilson concedes that a few days after his arrest in Ohio, he was brought back to Cabell County and appeared before Magistrate Johnny Rice to be "arraigned on three counts of possession with intent." (Docket No. 555 at 4). According to West Virginia's Rules of Criminal Procedure for Magistrate Courts ("Criminal Rules"), Rule 5(e), when a defendant is brought before a magistrate on a charge that is to be presented for indictment, the magistrate must "inform the defendant of the complaint and any affidavit filed therewith" and must schedule a preliminary hearing on the complaint unless waived by the defendant. Wilson further verifies that on November 13, 2006, a preliminary hearing was held to establish probable cause to support the charges against him. (*Id.* at 5). Consequently, a criminal complaint must have existed upon which Magistrate Rice conducted an initial appearance, set bail, and held a preliminary hearing. The contrary suggestion is simply implausible.[15]

In addition, documentary evidence supports the existence of a complaint. The United States has produced a copy of a Cabell County Court warrant inquiry system

---

[14] The Chief Clerk in the Cabell County Clerk's office has advised that Wilson's state case file was destroyed pursuant to the office's standard document retention policy.  Consequently, physical copies of the relevant documents no longer exist.

[15] Wilson's description of the "arraignment" by Magistrate Rice and the testimony elicited at the preliminary hearing verify that the language of the complaint against Wilson likely tracked the description of the offense contained in the arrest warrants.  (Docket No. 555 at 4-5).

report from October 27, 2006, the date of Wilson's arrest, showing that an arrest warrant for possession with intent to distribute had been issued for Donald Jamal Wilson on August 8, 2006, (Docket No. 543-2 at 1), as well as a copy of the docket report for Wilson's state case, which lists a "mag packet"[16] and "mag # 06-F-1217 with tape" as the first two entries on the docket sheet.[17] (Docket No. 543-3 at 1). The presence of these entries suggest that Magistrate Rice followed the procedure set forth in Criminal Rule 5.1(c)(2), which instructs the magistrate to transmit to the Clerk of the Circuit Court all papers and electronic proceedings of any preliminary hearing on a complaint in which a finding of probable cause is made. Moreover, the arrest warrants, themselves, demonstrate the existence of an underlying criminal complaint in that they incorporate the "essential facts" of the offenses charged in the complaint. (Docket No. 555-1 at 1–3) Criminal Rule 4 provides that the warrant shall be signed by the magistrate and "shall describe the offense charged in the complaint." Magistrate Chapman must have reviewed a complaint in order to have issued the warrants. The warrants contain language and information traditionally found in a complaint or affidavit. Each warrant identifies Wilson as the sole renter of 826 Rear Jefferson Avenue and describes the type and quantity of controlled substances discovered at that property as the basis for probable cause in support of the issuance of the arrest warrants. (*Id.* at 1-3). As such, these warrants contained indicia of a probable cause finding based on an affidavit or complaint

---

[16] The Cabell County Chief Clerk confirmed that a "mag packet" is the magistrate's case file, which is transferred to the circuit court at the time the state initiates felony criminal charges against a defendant. According to the Chief Clerk, a "mag packet" includes the complaint and affidavit submitted to support the issuance of an arrest warrant.

[17] The docket sheet also demonstrates that Wilson had a public defender, G. Stolze, representing him on the criminal charges. Certainly, his defense lawyer would have immediately challenged the absence of a criminal complaint.

and further investigation by Wilson's counsel was not warranted. The warrants were facially valid in that they identified Wilson, set forth the charges against him, demanded his arrest and presentation to the court, and were signed by an authorized magistrate. Moreover, the warrants were docketed by separate felony case numbers further indicating the existence of an underlying criminal complaint or complaints.  (*Id.*).

Finally, the record contains testimony by Detective Hunter in which he confirms that he "applied for" arrest warrants.  (Docket No. 57 at 14). Hunter testified that he sought warrants for the arrest of Wilson after the search of the Rear Jefferson Avenue apartment uncovered quantities of heroin, crack, and cocaine powder. There simply is no logical basis upon which to conclude that Hunter, an experienced detective, obtained arrest warrants without first drafting and presenting a criminal complaint to the magistrate and then executed those warrants over two months later without ever taking steps to correct a glaring foundational omission. It further defies logic to conclude that Wilson's trial counsel, who personally reviewed the Cabell County Circuit Court file and located numerous technical irregularities related to the search warrant, would inexplicably overlook the absence of a criminal complaint; particularly, as that same counsel filed multiple motions seeking to suppress evidence obtained during the searches and arrest of Wilson. In these motions to suppress, trial counsel argued that Wilson's arrest in Ohio, the search of his person and car, and search of his residence at 128 North Altamont Road were invalid because they were all the product of an illegal search at the 826 Rear Jefferson Avenue residence. Trial counsel's comprehensive investigation and efforts to suppress the evidence support the inference that trial counsel would have readily challenged any deficiency in the state proceedings if any such deficiency had existed. In order to accept Wilson's claim that no complaint ever existed, the Court would

have to abandon all common sense and believe that two county magistrates, an experienced detective, Wilson's public defender, and his two CJA attorneys all overlooked the absence of a charging document in the state proceedings. Wilson bears the burden of proof in this proceeding, and the United States is not obligated to disprove a petitioner's allegations. *Abdul–Aziz v. United States,* 2008 WL 4238943, at *5 n. 4 (N.D.W.Va. Sept. 12, 2008) (internal citation omitted); *see also Miller v. United States,* 261 F.2d 546, 547 (4th Cir. 1958) (holding same). Because the evidence does not support the veracity of the factual allegation essential to his claim, Wilson is unable to establish the ineffective assistance of counsel. "Judicial scrutiny of counsel's performance must be highly deferential, and a fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct *from counsel's perspective at the time.*" *Strickland*, 466 U.S. at 669 (emphasis added). At the time trial counsel represented Wilson, nothing in the record suggested that a challenge to the arrest warrant concerning the underlying affidavit or complaint would have merit. Counsel had no apparent reason to further investigate the complaint filed in the state court.  In addition, counsel repeatedly challenged the admissibility of the evidence.[18] Given the evidentiary record before the undersigned, there is nothing to support the contention that trial counsel's performance was objectively deficient; accordingly, counsel's actions fell within the wide range of objectively reasonable professional assistance.

      Wilson's claim that his counsel should have challenged the absence of the arrest

---

[18] The undersigned tends to agrees with the United States that Wilson is using ineffective assistance of counsel claims to relitigate his Fourth Amendment challenges. The record demonstrates excellent representation by Wilson's counsel in his tenacious attacks on the admissibility of evidence.

warrants in the NCIC is equally unavailing. According to Wilson, had trial counsel interviewed the Ohio law enforcement officers and obtained the dispatch records for his arrest, counsel could have verified that there were no outstanding warrants entered in the NCIC database for Wilson's arrest.[19] (Docket No. 572 at 8). Contrary to Wilson's assertion, his counsel addressed the alleged absence of the outstanding warrants in the NCIC database at the first suppression hearing. In response to counsel's concerns, Detective Hunter and Corporal Bills were asked to testify about the circumstances of Wilson's arrest and the officers' efforts to enter and confirm the existence of the warrants in the NCIC database. (Docket No. 57). Ultimately, the district court ruled that the Ohio officers were not required to check the NCIC database before arresting Wilson. (Docket No. 40). The West Virginia officers notified the Ohio officers that outstanding felony warrants for Wilson's arrest existed in West Virginia and that the Ohio officers were needed to arrest and detain Wilson. Those representations provided a basis for the arrest of Wilson as a fugitive from justice. Indeed, regardless of whether they were properly entered into the NCIC database, three outstanding felony warrants for Wilson's arrest were in place at the time of his detention in Ohio. Wilson's counsel raised the issue and the presiding district judge rejected it as a basis for suppression of evidence. Therefore, counsel's decision to abandon that particular ground was not objectively unreasonable.

Wilson's additional criticisms relating to the investigation and subpoenaing of the Ohio officers also lack merit. The record reflects trial counsel's detailed investigation into Wilson's arrest and the subsequent search of his person and automobile. Through

---

[19] In fact, Wilson concedes that his counsel did seek production of the dispatch records and videotape footage from the Ohio officer's cruiser and was informed that those documents did not exist. (Docket No. 555 at 21-22).

discovery, trial counsel inspected the multiple arrest warrants for Wilson, police incident reports of Wilson's arrest and search, and the evidence recovered from the search. (Docket No. 25, 36, 71, 114, and 125). At the April 16, 2007 suppression hearing, trial counsel questioned Detective Hunter and Corporal Bills at length regarding Wilson's arrest and search by the Ohio law enforcement officers. (Docket No. 57). Trial counsel inspected police reports of the arresting officers and copies of the evidence seized from Wilson's person and automobile. The evidence available to trial counsel in combination with testimony at the suppression hearing demonstrated that Wilson was arrested and searched pursuant to a valid NCIC warrant. Trial counsel could have reasonably concluded from this evidence and testimony that an interview of the actual arresting officers would have revealed no new information beneficial to Wilson's case. Counsel is not obligated to pursue every avenue of investigation, particularly when further investigation is likely to be fruitless. *Harrington v. Richter*, 131 S.Ct. 770, 789 (2011) (citing *Strickland*, 466 U.S. at 691). Trial counsel's decision was appropriate because of the inherent limitations in time and resources available to defense counsel during the course of criminal proceedings. Considering the improbability that the suggested interviews would have yielded any valuable information, trial counsel's decision not to interview the arresting officers from the Ohio Sheriff's Department was not objectively unreasonable and did not conceivably affect the outcome of the trial.

Wilson argues that trial counsel rendered ineffective assistance because trial counsel did not subpoena the arresting officers to appear at trial.  (Docket No. 509 at 5). Wilson alleges that trial counsel should have subpoenaed the arresting officers because

Detective Hunter's testimony regarding Wilson's arrest in Ohio was "inconclusive."[20] (Docket No. 555 at 48). Wilson's ineffective assistance of counsel argument fails because subpoenaing the arresting officers to testify at Wilson's trial would have, at best, been pointless and most likely would have elicited inculpatory evidence, further damaging Wilson's case. A strong presumption exists that the performance of counsel during trial fell within the wide range of reasonable professional assistance, and the court should not scrutinize counsel's tactical decisions in the manner of a "Monday morning quarterback." *See, e.g.*, *United States v. Terry,* 366 F.3d. 312, 317 (4th Cir. 2004). When evaluating a decision to call a particular witness to the stand, "[t]he difficulty of overcoming that general presumption is even greater ... given that 'the decision whether to call a defense witness is a strategic decision' demanding the assessment and balancing of perceived benefits against perceived risks, and one to which '[w]e must afford ... enormous deference.'" *Terry*, 366 F.3d at 317 (citing *United States v. Kozniski,* 16 F.3d795, 813 (7th Cir. 1994)) (internal quotation marks omitted). For that reason, decisions regarding the examination of witnesses generally do not form the basis of a successful *Strickland* challenge. Far from being ineffective, trial counsel's decision not to subpoena the arresting officers from the Scioto County Sheriff's Department to testify at trial likely benefitted Wilson. As established at the suppression hearing, Wilson was arrested and searched by agents of the Scioto County Sheriff's Department pursuant to a valid fugitive from justice charge. Considering the defense strategy and the likely harm that would have

---

[20] To the extent that Wilson argues his rights under the Confrontation Clause were violated because the arresting officers were not subpoenaed to appear at trial, the undersigned finds this claim to be without merit. The Confrontation Clause bars the "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had a prior opportunity for cross-examination." *Crawford v. Washington,* 541 U.S. 36, 53–54 (2004). Respondent did not introduce any testimonial statements of Ohio law enforcement officers at trial. Consequently, there was no violation of the Confrontation Clause for counsel to challenge.

resulted from the arresting officer's testimony at trial, counsel's decision not to subpoena the arresting officers from the Scioto County Sheriff's Department was reasonable and neither constituted ineffective assistance nor conceivably affected the outcome of the trial.[21]

### C.      Remaining Claims of Ineffective Assistance of Appellate Counsel

Wilson asserts that appellate counsel provided ineffective assistance by failing to raise certain discrepancies concerning the clerk's seal or stamp on documents related to the search of 826 Rear Jefferson Avenue. (Docket No. 509 at 6). According to Wilson, appellate counsel failed to conduct any investigation into these discrepancies even though they were readily apparent from the evidentiary record. (Docket No. 555 at 49). Wilson's ineffective assistance claim is meritless. The discrepancies in the documents related to the search of 826 Rear Jefferson Avenue were thoroughly examined by trial counsel and were found by the district court to be harmless. Appellate counsel wisely decided not to raise on appeal this frivolous claim.

At Wilson's first suppression hearing, trial counsel for Wilson cross-examined Detective Hunter regarding the different date stamps on the complaint for a search

---

[21] Having found counsel's performance to be objectively reasonable, the undersigned need not address the issue of prejudice. However, it bears note that Wilson presents no compelling argument to support his conclusion that "there is a reasonable probability that the verdict would have been different absent the excludable evidence" in his case. Instead, Wilson summarily asserts that he was prejudiced when evidence seized during his arrest was used at trial. (Docket No. 555 at 19). According to Wilson, absent the evidence seized during his arrest, he would not have been convicted of maintaining a dwelling at 128 North Altamont for the purpose of distributing a controlled substance and he would have "stood a much better chance" of being acquitted on the remaining charges. (*Id.* at 28). Even when excluding the evidence collected during Wilson's arrest and from 128 North Altamont, the remaining evidence of the drugs and drug paraphernalia found in the Rear Jefferson Avenue apartment and of Wilson's involvement in a drug trafficking conspiracy was overwhelming and likely would have resulted in his convictions on both counts. As such, Wilson would still be subject to a mandatory sentence of life without parole plus 240 years.

warrant and supporting affidavit. Detective Hunter explained that he was not familiar with the procedures of the clerk's office and could not provide an answer to the question. (Docket No. 543-1 at 22–23). At most, Wilson has identified a clerical error that had no effect on the validity of the search warrant itself or the execution of the search warrant. Presenting such a claim to the Fourth Circuit would have only undermined appellate counsel's credibility and would not have altered the outcome of Wilson's appeal. Further, because the undersigned finds this claim to be frivolous, appellate counsel's decision not to raise it on direct appeal was consistent with responsible advocacy and was objectively reasonable. Consequently, Wilson's ineffective assistance of appellate counsel claim must also be rejected.

### D.    Challenge of Forfeiture Proceedings

Wilson posits that the district court erroneously granted Respondent's request for the forfeiture of currency belonging to Wilson when there was no evidence to connect the currency with any illegal activity. (Docket No. 509 at 9). According to Wilson, at the time of his arrest in Ohio, law enforcement agents wrongfully seized $13,963 from his person, which was ultimately awarded to Respondent. Wilson argues that this award was invalid because Respondent failed to comply with established forfeiture procedures and the district court lacked subject matter jurisdiction over the forfeiture proceedings.[22] (Docket No. 555 at 49–51).

Title 28 U.S.C. § 2255 authorizes an attack on the *custodial* component of a sentence. Although the Fourth Circuit has not directly addressed the issue, other circuits

---

[22] Wilson previously raised this issue on appeal, and the Fourth Circuit upheld the district court's forfeiture order in *United States v. $13,963.00, More or Less, in U.S. Currency*, 382 Fed.Appx. 268 (4th Cir. 2010) (*per curiam*).

have concluded that for this reason § 2255 is not the proper vehicle for collaterally challenging forfeiture orders. *See United States v. Banguera,* 1995 WL 449891, *1 (5th Cir. June 30, 1995); *Rodriguez v. United States,* 1997 WL 770636, *1 (1st Cir. Dec. 12, 1997); *Soldier v. United States,* 2009 WL 455830, *2 (D.N.D. Feb. 23, 2009); *Murphy v. United States,* 2009 WL 424490, *6 (N.D.Ill. Feb. 17, 2009); *United States v. Miller,* 2003 WL 24057592, *4 (N.D.N.Y. Aug. 18, 2003). Inasmuch as a § 2255 Motion to Vacate is not the appropriate vehicle to challenge a forfeiture action, this claim should be dismissed.

### E.      Fifth Amendment Due Process Challenge

Finally, Wilson argues that he was denied a fair trial, as guaranteed by the Due Process Clause of the Fifth Amendment. In support of this argument, Wilson contends that Respondent presented fabricated documents at the suppression hearing and also presented perjured testimony at trial. Wilson contends that Detective Paul Hunter and Assistant United States Attorney Stephanie L. Haines, acting in concert, introduced an altered search warrant at the suppression hearing held on April 16, 2007. (Docket No. 555 at 52–54). Additionally, Wilson asserts that the federal prosecutor knowingly solicited false testimony from Wilson's former co-defendant, Fiasilli Bartram. At trial, Assistant United States Attorney Gregory McVey asked Ms. Bartram if she had purchased crack cocaine from Wilson. Ms. Bartram answered in the affirmative, stating that she had purchased crack cocaine from Wilson previously, even though she had made contrary statements to the police prior to trial. (*Id.* at 54). Therefore, Wilson argues, Mr. McVey was aware that Ms. Bartram's testimony at trial was false and should not have introduced her dishonest testimony to the jury. (*Id.*).

In response, the United States contends that the contradictory statements made by Ms. Bartram were the subject of impeachment at trial and, ultimately, the jury was charged with deciding which statements were credible. In addition, Respondent argues that Wilson's claim of fabricated documents is factually inaccurate because the existence, content, and foundation of the search warrant were fully explained at the suppression hearings and the validity of the warrant was accepted by the court. Respondent emphasizes that, in any event, Wilson is prohibited from asserting prosecutorial misconduct as a ground for relief because he failed to raise it on direct appeal. Thus, Wilson's claim has been procedurally defaulted. In reply, Wilson excuses his failure to raise these due process claims on direct appeal by blaming the incompetence of his appellate counsel. Wilson's position that he has established cause for his procedural default based upon attorney error rings hollow; particularly, as Wilson never raised this error as part of his ineffective assistance of counsel claim. More importantly, Wilson fails to substantiate the claim of prosecutorial misconduct.

It is well-established that a constitutional error that could have been raised on appeal may not be raised for the first time in a § 2255 motion, unless the movant can show either (1) "cause" that excuses the failure to raise the error on appeal and "actual prejudice" resulting from the error, or (2) that a miscarriage of justice would occur if the court refuses to entertain the collateral attack. *Massaro v. United States*, 538 U.S. 500, 504 (2003) (citing *Bousley v. United States*, 523 U.S. 614, 621–22 (1998); *United States v. Frady*, 456 U.S. 152, 167–68 (1982)); *United States v. Mikalajunas,* 186 F.3d 490, 492–93 (4th Cir. 1999). Attorney error can serve as cause for default, but only if it amounts to a violation of the defendant's constitutional right to effective assistance. *Edwards v. Carpenter,* 529 U.S. 446, 451 (2000). Therefore, Wilson must show that by

failing to challenge the issue of prosecutorial misconduct, counsel's performance fell below an objective standard of reasonableness, and that Wilson was prejudiced by such constitutionally deficient representation. *Strickland v. Washington,* 466 U.S. 668 (1984).

      1.    *Procedural Default*

Wilson cannot overcome the procedural bar because he did not demonstrate that that appellate counsel's failure to raise claims of prosecutorial misconduct resulted in "actual prejudice." To establish "actual prejudice," Wilson must show " 'not merely that the errors at his trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions.' " *McCarver v. Lee,* 221 F.3d 583, 592 (4th Cir. 2000) (quoting *United States v. Frady,* 456 U.S. 152, 170 (1982)). Wilson's burden to prove prejudice is "significantly higher" than it would be to prove error on direct appeal. *Frady*, 456 U.S. at 166. As it is highly probable that a claim of prosecutorial misconduct would have been unsuccessful on appeal, Wilson has failed to demonstrate the requisite cause or actual prejudice to overcome § 2255's procedural bar. Furthermore, because Wilson makes no colorable claim that he is actually innocent of the crime for which he stands convicted, Wilson's claims of prosecutorial misconduct are procedurally barred.

      2.    *Search Warrant*

Although Wilson's claims of prosecutorial misconduct are procedurally barred, the undersigned nonetheless addresses the merits of Wilson's arguments. Wilson has failed to show that the search warrants introduced at trial were fabricated or altered. The United States provided Wilson and his counsel with the search warrant documents during discovery. At the suppression hearing, Detective Hunter explained at length the procedure by which he obtained the search warrant at issue. (Docket No. 543-1 at 3–43).

The district court and Fourth Circuit examined the search warrant and supporting affidavits during the course of Wilson's trial and direct appeal and found the warrant to be valid and properly executed. (Docket No. 499). Accordingly, the reliability of the search warrant has already been examined and established.

3.      *"Perjured" Testimony*

Wilson fails to substantiate his claim of perjured testimony. Inconsistent statements made by a witness are not, standing alone, proof of perjury. Under the guise of a claim of prosecutorial misconduct, Wilson effectively asks the Court to overturn the jury's credibility finding with respect to the testimony of Ms. Bartram. During the investigation, law enforcement agents interviewed Ms. Bartram. Ms. Bartram initially denied purchasing crack cocaine from Wilson. At trial, Ms. Bartram described her involvement in the purchase and distribution of narcotics. (Docket No. 442-3 at 1). Ms. Bartram testified that she often purchased crack for resale from Herbert Fordham and cocaine for personal use from Laverge Johnson. (*Id.* at 6–9). She further testified that she obtained her crack from Herbert Fordham and occasionally from Wilson at or near the Rear Johnson Avenue apartment. (*Id.* at 12). Ms. Bartram described going to the apartment and observing Fordham break a piece of crack off of a larger piece to sell to her.  (*Id.* at 14–15). Ms. Bartram identified the residence on North Altamont Road as Wilson's home, but denied ever purchasing drugs from Wilson at that location.  (*Id.* at 17).  Ms. Bartram also recalled driving Rashard Wilson to the North Altamont Road home on one occasion so that he could buy crack cocaine from Wilson. (Docket No. 442-3 at 17–18).  Finally, Ms. Bartram testified regarding a July 2006 incident involving her, Rashard Wilson, and Laverge Johnson. Ms. Bartram described their collective efforts to sell crack

cocaine and heroin from a motel room and stated that the heroin that they sold was supplied by Wilson.  (*Id.* at 22–26).

The weight of the evidence against Wilson suggests that Ms. Bartram initially lied to the police and, as she maintained, was telling the truth at trial.[23] In any event, Wilson's trial counsel cross-examined Ms. Bartram on her inconsistent statements. Therefore, the jury was aware of the contradiction and was charged with resolving the credibility issue. Consequently, Wilson's claims of prosecutorial misconduct are clearly unfounded. As such, Wilson's counsel can hardly be called ineffective for failing to raise them on appeal.

## V.    **Proposal and Recommendations**

For the reasons set forth above, the undersigned respectfully **PROPOSES** that the District Court accept and adopt the findings proposed herein and **RECOMMENDS** the following:

1.    Movant's Application Under 28 U.S.C. § 2255 for Writ of Habeas Corpus by a Person in State or Federal Custody (Docket No. 509) be **DENIED**; and

2.    This civil action be **DISMISSED, with prejudice,** and removed from the docket of this Court.

Movant is notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, Movant shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of

---

[23] It is worth noting that even without Ms. Bartram's testimony, there was overwhelming evidence to support Wilson's conviction on the conspiracy charge.

this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown. Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing parties, Judge Chambers and Magistrate Judge Eifert.

The Clerk is instructed to provide a copy of this "Proposed Findings and Recommendations" to the Movant, Respondent, and any counsel of record.

**FILED**:  April 10, 2012.

Cheryl A.  Eifert
United States Magistrate Judge